UNITED STATES of America,
Plaintiff–Appellant,

v.

Allen Thomas CAGLE,
Defendant–Appellee.

No. 87–1864.

United States Court of Appeals,
Fifth Circuit.

July 1, 1988.

Clifford R. Cronk, III, and LeRoy Morgan Jahn, Asst. U.S. Attys., El Paso, Tex., Helen M. Eversberg, U.S. Atty., San Antonio, Tex., for plaintiff-appellant.

Alejandro B. Gonzalez, Asst. Federal Public Defender, El Paso, Tex., for defendant-appellee.

Before BROWN, KING and HIGGINBOTHAM, Circuit Judges.

KING, Circuit Judge:

The government appeals from the district court's grant of Allen Thomas Cagle's motion to suppress evidence seized from him at the El Paso International Airport. As we agree with the district court that the evidence was the result of an unlawful seizure, we affirm.

I.

On June 14, 1987, United States Border Patrol agent John Moore ("Moore") was assigned to duty at the El Paso International Airport.[1] At approximately 3:00 a.m., Moore observed Allen Thomas Cagle

---

1. In reviewing a district court's ruling on a motion to suppress based on testimony at a suppression hearing, we must accept the district court's factual findings unless they are clearly erroneous or are influenced by an incorrect view of the law. *United States v. Maldonado,* 735 F.2d 809, 814 (5th Cir.1984). Further, we must view the evidence in the light most favorable to the party that prevailed below. *Id.* Therefore, this opinion will reflect, in large measure, the factual findings of the district court below. Those findings are supported by the testimony at the suppression hearing and are, for the most part, undisputed.

("Cagle") enter the airport terminal carrying a blue suitcase. Cagle, who appeared nervous to Moore, proceeded in a hurry to the American Airlines ticket counter. There were four or five other people in front of Cagle in the line. Moore knew that the next scheduled departure for an American Airlines flight was at 3:39 a.m. According to Moore, however, Cagle appeared to be looking around a lot while he was in line, as if he were nervous or in a hurry. After checking his suitcase, Cagle left the ticket counter and headed for the departure gate, glancing around him as he did so. By this time, Moore's suspicions were aroused and, along with another agent, he proceeded to the American Airlines baggage area to examine Cagle's bag.

Moore removed Cagle's suitcase from the baggage conveyor belt and shook it; nothing rattled. The suitcase—which was hard-shelled—was then placed on the floor, and Moore attempted to feel its contents. He was unable to detect any shoes, bottles or other items of that nature inside the suitcase. At that point, the agents apparently noticed a substance, which appeared to be baby powder, issuing from a seam in the suitcase. The agents compressed the sides of the suitcase and smelled baby powder.[2] At that point, Cagle's suitcase was taken to

the Border Patrol office at the airport and the agents went to the departure gate area in search of Cagle.

The agents found Cagle waiting for his flight to board. Moore approached Cagle and identified himself. Moore asked Cagle if he had checked any luggage and Cagle responded that he had checked one suitcase. Moore asked to see the baggage check and Cagle refused to show it to him. The agents then asked Cagle to accompany them to their office; Cagle declined their offer. The agents then advised Cagle that he was free to leave, and Cagle boarded his flight.

After Cagle and his flight departed without the suitcase, the agents contacted the El Paso Police Department and requested a narcotics detection dog. The dog alerted to Cagle's suitcase, indicating the presence of narcotics. The agents then contacted the Drug Enforcement Administration ("DEA") which sent DEA agent Jose A. Delgado ("Delgado") to the scene. Delgado took the suitcase to the DEA office and obtained a search warrant at approximately 10:45 a.m. The suitcase was then opened, and was found to contain various items of clothing along with eleven pounds of marijuana in a securely packaged parcel.[3]

2. At the suppression hearing, Moore testified that he smelled marijuana as well as baby powder. In finding Moore's testimony on this point not credible, the district court wrote:

The manner in which the marijuana was wrapped is carefully described in the return on the search warrant executed later by Special Agent Delgado of the Drug Enforcement Administration (Government's Exhibit 1). Delgado describes each of the two packages of marijuana as being "contained in a white plastic bag, further contained in plastic, further contained in a white plastic bag and surrounded by gray duct tape". The testimony indicates that the packages of marihuana were further surrounded by clothing, were contained within a locked hard-sided suitcase, and that the suitcase was permeated with the strong smell of baby powder. Under the circumstances, Agent Moore could not possibly have detected the smell of marihuana within the suitcase unless his nose were the equal of that possessed by the vaunted canine Temo. The Court concludes that what really happened is that Moore smelled the scent of baby powder, knew from his training that baby powder is sometimes used to mask the scent

of marihuana, and talked himself into believing that he had actually detected the scent of marihuana (footnote omitted).

The district court also noted a discrepancy between Moore's testimony and a report written by Moore on the day of the incident. In his report, Moore stated that he smelled baby powder with "a hint of marijuana." His testimony at the suppression hearing intimated that he had sensed a more certain and stronger scent. As a participant in the proceedings, the district court was able to view Moore's demeanor and bearing on the stand—a luxury not afforded this court. Moreover, we find the district court's analysis, with respect to the likelihood of Moore's detection of a marijuana scent given the packaging method employed, logically compelling. Therefore, we find no clear error in the district court's finding that the agents could not smell marijuana.

3. It is unclear exactly when the dog sniff occurred. The government, pointing to a statement in Cagle's memorandum of law in support of his motion to suppress, argues that the sniff occurred at 3:35 a.m.—twenty-five minutes after the suitcase was initially taken from the convey-

On August 18, 1987, a federal grand jury returned a two count indictment charging Cagle with several violations of federal narcotics laws. Count One alleged that Cagle "unlawfully, knowingly, and intentionally did possess with intent to distribute a quantity of marihuana, a Schedule I Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1)." Count Two charged that Cagle used a facility in interstate commerce to facilitate the carrying on of an unlawful activity involving controlled substance offenses in violation of the Travel Act, Title 18, United States Code, section 1952. On September 25, Cagle filed a motion to suppress all the evidence obtained from him during the airport episode. On October 15, the district court granted Cagle's motion. The court concluded that when the agents took Cagle's suitcase to their office and thereby prevented it from being loaded on the departing American Airlines flight, they performed a "seizure" in the fourth amendment sense. Finding that the agents did not have probable cause for the seizure until much later, when the narcotics dog alerted, the court ruled that the seizure was illegal and suppressed all the evidence arising directly or indirectly from that seizure. The government later filed timely notice of appeal from the district court's grant of Cagle's suppression motion.

## II.

On appeal, the government argues that the district court erred in finding that the agents unlawfully seized Cagle's suitcase when, without a warrant or probable cause, they prevented it from being loaded on Cagle's flight. The government contends that the agents' actions constituted merely an investigative detention, *see Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), so minimally intrusive of fourth

amendment interests that strong government interests justified the seizure based only on specific articulable facts that the suitcase contained contraband, *see United States v. Place,* 462 U.S. 696, 706, 103 S.Ct. 2637, 2644, 77 L.Ed.2d 110 (1982). The district court concluded, and the government does not dispute, that probable cause to seize Cagle's suitcase did not exist until the narcotics sniffing dog alerted to the presence of narcotics in the bag. Therefore, narrowing the focus of our inquiry to the agents' actions prior to the dog's alert, we must determine whether those actions constituted a seizure and, if so, whether or not the agents needed probable cause to justify that seizure.

## III.

"A 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property." *United States v. Jacobsen,* 466 U.S. 109, 113, 104 S.Ct. 1652, 1656, 80 L.Ed.2d 85 (1983). It is clear that the agents' removal of Cagle's bag from the conveyor belt, their compression of the bag to procure a scent, and their subsequent sniff of the bag did not constitute a seizure. *See United States v. Lovell,* 849 F.2d 910, 915 (5th Cir.1988); *United States v. Garcia,* 849 F.2d 917, 919 (5th Cir.1988). It is equally apparent, however, that the agents' prolonged detention of the suitcase surely did so. In *Lovell,* there was no suggestion that if the agents had not smelled marijuana, Lovell's travel would have been interfered with or his expectations with respect to his luggage—that the common carrier would transport the bags to Lovell's destination for him to reclaim when he arrived—frustrated. *Lo-*

---

or belt. We note that there is no testimony to support such a conclusion. In fact, given that the agents contacted the El Paso police *after* Cagle boarded his flight—a flight scheduled to leave at 3:39 a.m.—it seems improbable that the canine unit could have been contacted, brought to the airport, taken to the Border Patrol office and exposed to the suitcase by 3:35 a.m. While the district court did not arrive at a time figure

in its statement of facts, it did so in addressing the constitutional propriety of the agents' detention of Cagle's luggage when it found that probable cause for the seizure did not exist "until at least an hour and one-half later, when Canine Unit Temo was brought to the Border Patrol office...." After reviewing the record, we can find no clear error in this finding.

*vell,* at 916. The momentary delay occasioned by the agents' actions, therefore, did not constitute a meaningful interference with Lovell's possessory interests in his checked luggage. *Id.* Here, by contrast, Cagle's expectations were clearly frustrated when his suitcase failed to make his flight solely because of the agents' actions. Under the circumstances, we must conclude that there was a seizure of Cagle's suitcase when the agents' prolonged detention of the bag caused it to miss Cagle's flight.

■ Our inquiry is not complete, however, for we must now "examine whether the agents' conduct in this case was such as to place the seizure within the general rule requiring probable cause for a seizure or within *Terry* 's exception to that rule." *See Place,* 462 U.S. at 708, 103 S.Ct. at 2645. We need not, and do not, decide whether the agents possessed a reasonable suspicion that Cagle's suitcase contained contraband for the agents' conduct clearly exceeded the limits of a permissible investigatory detention under *Terry* and *Place.* We note that the detention in this case

lasted approximately an hour and a half. In *Place,* the Court, while declining to adopt any outside time limitation on a permissible *Terry* stop, noted that a ninety minute detention is sufficient, in and of itself, to render a seizure unreasonable. *Id.* at 710, 103 S.Ct. at 2646. We fail to see how this ninety minute detention was any less intrusive than that condemned in *Place.* Moreover, just as in *Place,* the agents' conduct disrupted Cagle's travel plans.[4] Finally, we observe, as did the Court in *Place,* that the police could have employed more diligent, less intrusive investigatory techniques.[5] *See id.* at 709, 103 S.Ct. at 2645. Consequently, we must conclude that the seizure of Cagle's luggage went beyond the narrow authority possessed by police to briefly detain luggage reasonably suspected to contain narcotics. *See id.* at 710, 103 S.Ct. at 2646. Therefore, probable cause was required to justify the warrantless seizure of the suitcase. Since it is undisputed that the agents did not have probable cause, the seizure was unreasonable and the district court properly granted Cagle's motion to suppress.[6]

---

**4.** In *Place,* the Court stressed that the violation "was exacerbated by the failure of the agents to accurately inform respondent of the place to which they were transporting his luggage, of the length of time he might be dispossessed, and of what arrangements would be made for return of the luggage if the investigation dispelled the suspicion." *Id.* The Court recognized that while the person whose luggage is detained is technically free to continue his travels, he may be effectively restrained from doing so as "he is subjected to the possible disruption of his travel plans in order to remain with his luggage or arrange for its return." *Id.* at 708 & n. 8, 103 S.Ct. at 2645 & n. 8. The mere fact that Cagle would not have learned of the seizure until his arrival at his destination does not eliminate the possibility of travel disruption. At the very least, Cagle would have been subjected to the severe inconvenience inherent in delayed baggage arrivals; at the worst, Cagle (and possibly the airline) would also have been completely unaware of the location of the suitcase for an uncertain period of time. The agents gave Cagle no information concerning their plans for his suitcase. Therefore, while Cagle was not effectively restrained prior to his departure, he most certainly would have been upon arrival.

**5.** The agents knew the arrival time and destination of their suspect and might have arranged for a narcotics detection dog to be available at

that location, minimizing the fourth amendment intrusion. *See Place,* 462 U.S. at 709, 103 S.Ct. at 2645. Moreover, despite the apparent frequency of luggage seizures at the El Paso International Airport—Moore alone testified to having handled approximately twenty-five such cases—there are evidently no narcotics detection dogs stationed at the airport; rather, the agents must contact the El Paso Police Department and request the services of a canine unit. Were a canine unit stationed at the airport, Cagle's luggage could have been momentarily detained while a dog sniff took place in the baggage area. *See Florida v. Royer,* 460 U.S. 491, 506, 103 S.Ct. 1319, 1329, 75 L.Ed.2d 229 (1983) (plurality opinion). "This course of conduct also would have avoided the further substantial intrusion on respondent's possessory interests caused by the removal of his luggage to another location." *Place,* 462 U.S. at 709, 103 S.Ct. at 2645.

**6.** We note in passing that the government also faults the district court for allegedly having required the government to proceed first in presenting evidence at the suppression hearing. The government contends, for the first time on appeal, that by requiring it to present evidence, the district court placed the burdens of production and persuasion on the government when, in a suppression hearing, both burdens general-

## IV.

For the foregoing reasons, we AFFIRM.

ly rest upon the movant. *See United States v. Charles,* 738 F.2d 686, 692 (5th Cir.1984) (citing cases). We cannot countenance this belated objection to the district court's orchestration of the proceedings. First, there is no evidence to support the government's contention that the district court *required* the government to introduce witnesses. Second, even if that were the case, the government's failure to object below precludes our consideration of its claim. The government's witnesses and documents provided ample support for Cagle's specific factual allegations of an unlawful seizure. In fact, those witnesses were the only ones who could attest to the events surrounding the seizure since Cagle was ignorant of the agents' actions. By failing to object below and by voluntarily presenting those witnesses itself, the government obviated any need for Cagle to do so. Finally, we are mindful of the fact that in a number of identical hearings before the same judge, the same United States Attorney's Office has consistently proceeded first, and has voluntarily presented witnesses, without objection below. The government cannot wait for an adverse judgment before complaining of an alleged procedural irregularity it embraced below. We see no reason to permit the government to raise this issue for the first time on appeal.