UNITED STATES of America, Plaintiff,

v.

**Kevin Carlyle WARD, Defendant.**

**No. IP 92–0136–CR–01–T/F.**

United States District Court,
S.D. Indiana,
Indianapolis Division.

June 11, 1996.

---

⊶57

⊕57

Melanie Conour, U.S. Attorney's Office, Indianapolis, IN, for Plaintiff.

Peter Kmeto, Sacramento, CA, for Defendant.

## ENTRY REGARDING DEFENDANT'S MOTION TO SUPPRESS

TINDER, District Judge.

This matter comes before the court upon the motion of the Defendant, Kevin Carlyle Ward ("Ward"), to suppress certain evidence relevant to this case under Rule 12(b)(3) of the Federal Rules of Criminal Procedure. The court, having considered the briefs and the arguments of the parties and having conducted a hearing on this matter, finds that the Defendant's motion to suppress should be **DENIED** for the reasons set forth below.

## I. Introduction

Law enforcement authorities cannot detain a traveler, nor the traveler's accompanying luggage, in the absence of a reasonable, articulable suspicion of involvement in criminal wrongdoing. Even if detention is authorized, it can only last for a reasonable length of time. To hold the traveler or his luggage for more than a brief investigative period, probable cause is required. These are common themes, played out in all arenas of travel in these drug-infested times. This case, however, presents a slight variation on these themes, perhaps raising a new question—can luggage be treated any differently when the traveler and his luggage travel to the same destination by different means? This question will be explored in the instant entry. But first, the story of the journeys of Defendant Ward and a suitcase he claims must be told. The information on which this story is based is found in the affidavits submitted in connection with the parties' briefs and a hearing held on a motion to suppress.

Some time prior to 9:00 a.m. on August 31, 1992,[1] Ward came into possession of a brown "World Traveler" brand suitcase. On the date in question, the suitcase was found to contain a kilogram of cocaine and a .40 caliber Glock handgun. Ward now seeks to prevent the government from introducing the bag and its contents into evidence at trial. He also seeks to suppress the confession he gave when he realized that the United States Drug Enforcement Administration ("DEA")

---

[1.] The court notes that the Defendant's brief and Ward's testimony at the hearing refer to August 30, 1992 as the date upon which the events in question began. However, the court's review indicates that August 31, 1992 is a more likely starting date, and that date will be referred to throughout this entry. In either event, the exact date is essentially irrelevant to the outcome of the Defendant's motion.

knew what was inside the bag.[2] An evidentiary hearing and argument was held and the facts about what happened to the bag which were developed at the hearing will be discussed below. After determining these facts, the court will reach certain legal conclusions and give its reasons for denying the motion to suppress.

## II. Findings of Fact

On or about August 31, 1992, Ward purchased a ticket in Los Angeles, California for a trip on a Greyhound bus known as the "LA Express." The ticket authorized travel on that bus from Los Angeles to Indianapolis, Indiana. It was Greyhound's policy to allow its travelers to carry two small bags or similar items onto the interior of the bus and to check up to two other items to be carried in the luggage compartment without any additional charge. The luggage compartment was located below the interior of the bus and was accessible only from the exterior of the bus. In order to check a bag for the luggage compartment, it would have to be brought to the station at least thirty minutes prior to the scheduled departure of the bus. Apparently, Ward checked the suitcase mentioned above with a baggage handler for Greyhound some time prior to 9:00 a.m. on August 31. To all appearances, the bag looked like any other piece of luggage that was checked with Greyhound for that particular trip. The suitcase had an identification tag on the exterior listing the name of "Eric Ford, 840 E. 74th Street, L.A., CA 90001" with a telephone number containing only the area code prefix "213." After checking the bag, Ward was given a claim ticket, numbered 51–69–23. Ward then left the Los Angeles Greyhound station without ever boarding the bus.

The LA Express was scheduled to travel east from Los Angeles and make various stops along the way.[3] Most significant to this case, the bus was scheduled to stop in Springfield, Missouri at approximately 8:15 a.m. on September 1, 1992. The trip to Indianapolis was to be completed (via St. Louis, Missouri and other brief intermediate stops) at about 6:25 p.m. that same day.

Apparently Ward never intended to travel on the LA Express with his bag. Instead, he flew out of Los Angeles the next day—September 1, 1992—to Indianapolis, arriving at approximately 3:00 p.m. His plan then was to retrieve the bag from Greyhound after it arrived. But, as will be seen, those plans went awry because of things that happened to his bag during its journey to Indianapolis.

After his arrival in Indianapolis, Ward, oblivious to the trouble his bag had encountered, made several calls to the Indianapolis Greyhound station to confirm the expected arrival time of the LA Express. During each of those calls, Ward was assured that the bus was running pretty much on time. Eager to obtain his bag and be on his way, Ward arrived at the Indianapolis Greyhound terminal at approximately 7:00 p.m. on September 1. He then presented his claim ticket for the bag and, after a brief delay, was handed a World Traveler suitcase which at first glance looked like his. However, just as the suitcase might have appeared innocuous to most observers, as the old saw goes, looks can be deceiving. For example, the man who handed Ward his bag appeared to be a Greyhound luggage handler; in fact, as Ward regretfully learned later, the man was not a baggage handler at all, but, instead, was an agent of the DEA. After being handed the bag, Ward turned to leave the station. However, he quickly realized that things were not as they initially appeared. The bag that he was handed was not his and he turned to point that out, meanwhile grabbing back his claim ticket. Ward then rushed out of the bus station, only to be immediately captured by the DEA. Special Agent Noel Gaertner placed Ward under arrest. Shortly thereafter, Ward confessed to being the person responsible for the bag and that he had intended to distribute the cocaine in it somewhere in the Indianapolis area.

---

**2.** These events took place in 1992 and are only now the subject of prosecution. The reason for this delay is that shortly after the Defendant was arrested, he absconded and was only recently rearrested. The Indictment has been pending since 1992.

**3.** Perhaps it would be better to describe the route as generally eastward. The route takes the bus through various western cities (*e.g.*, Albuquerque, New Mexico; Amarillo, Texas; Oklahoma City, Oklahoma) and numerous other stops along the way to St. Louis, Missouri.

A man named Andre La Adams ("Adams") also purchased a ticket on the LA Express in Los Angeles on August 31, 1992. Adams actually boarded the bus.[4] Adams brought at least two bags with him to the bus which he carried into the interior of the bus. His bags were labeled with the brand name "Ricardo of Beverly Hills." Adams kept a garment bag with him at his seat on the bus. The second Ricardo bag belonging to Adams was in the overhead storage rack above Adams's seat on the bus. It would appear to a reasonable observer that both bags were manufactured by the same company, were of the same color, and had the same type of brass locks and appeared to have suffered about the same amount of wear and tear. Adams was scheduled to ride the Greyhound to St. Louis, Missouri.

At approximately 9:30 a.m. on August 31, 1992, the LA Express left Los Angeles as scheduled. Adams was on the bus with his two pieces of luggage. Also stored in the luggage compartment of the bus was Ward's World Traveler bag. As that day and night wore on, the LA Express continued its journey to the midwest. At about 8:35 a.m. on September 1, 1992, the bus pulled into the Greyhound terminal at Springfield, Missouri.[5]

Apparently, Greyhound buses traveling from the West through Springfield had been used by drug couriers with some regularity to transport illegal controlled substances from Los Angeles to locations at or east of Springfield. This had been going on since at least January of 1992. This is known, at least in part, because the DEA had been participating in interdiction inspections of luggage and passengers on eastbound buses passing through Springfield since at least January of 1992 when Special Agent Carl Hicks ("Hicks") began working that detail. In many instances, these interdiction inspections were conducted in conjunction with lo-

cal law enforcement officers. Such was the case on September 1, 1992. Springfield, Missouri Police Department ("SPD") Detective Mark Deeds participated with Agent Hicks in an interdiction inspection of the LA Express and its contents. Deeds and Hicks were waiting for the bus when it arrived. At some point during the inspection, Detective Deeds struck up a conversation with Andre La Adams. During the course of this conversation, Deeds developed various suspicions about Adams for reasons that are not relevant to these proceedings. Eventually, Adams consented to allowing Deeds to search the Ricardo of Beverly Hills designer garment bag in his custody. Following that search, Deeds observed a second bag, identical in manufacture, color and wear as the garment bag, which was located in the overhead storage compartment above Adams. Adams denied ownership of the bag as did all of the other passengers on the bus. Subsequently that bag was searched and it was found to contain two kilograms of cocaine. Adams was then arrested at approximately 8:40 a.m. After learning that Adams had boarded the bus in Los Angeles, DEA Agent Hicks began checking the remainder of the luggage on the bus to determine whether Adams had checked other baggage that he had not personally carried onto the bus.

Hicks was an experienced drug investigator and was particularly experienced at drug interdiction investigations. As of 1992, he had been with the DEA for over twenty years and had been working on interdictions for about five years. One of his previous assignments had been to the Los Angeles area. While stationed in Los Angeles, he became familiar with drug activity intelligence and general crime information about that city. One of the parts of Los Angeles with which he became familiar was South Central Los Angeles, which was known to be a high crime area. Many of the crimes committed in that area involved illegal drug

---

4. There is no indication in the record as to whether Ward and Adams knew each other or that either was aware of what was in each other's suitcases.

5. The Springfield terminal was a meal stop for the LA Express and the bus generally remained there for approximately thirty minutes, even

when the bus arrived late. It is undisputed that Hicks's activities on the day in question were completed within the time the bus was usually stopped in Springfield and that Hicks's activities caused no additional delay of the bus or its passengers (other than Adams) on the day in question.

activity. It was commonly known to Hicks and other drug investigators in the Springfield area that illegal drugs were generally transported from West to East, with Los Angeles being a source city for various illegal controlled substances. One method being used to transport drugs was the technique utilized by the Defendant in this case, that is, checking a bag onto a common carrier and either traveling with that bag and later claiming it or traveling without that bag and retrieving it after the common carrier had arrived at its destination. Hicks had, on several occasions, discovered narcotics in such unaccompanied baggage during his interdiction activities in Springfield.

Springfield, Missouri was the last stop for the LA Express prior to the stop at St. Louis, Missouri. The St. Louis stop was at the Greyhound terminal in that city, which is considered a major hub for the Greyhound lines. All Greyhound buses coming into the terminal in St. Louis make a stop there and very often passengers, along with their luggage, change from one bus to another at the St. Louis location. Because of the high activity level at the St. Louis bus station, a less busy stop, such as Springfield, is a much more felicitous location for the conduct of an interdiction inspection.

With his knowledge regarding the Adams arrest, Agent Hicks began his inspection of the other luggage. He located one bag in the luggage compartment of the bus which caught his attention. It was Ward's World Traveler bag. He was drawn to that bag because the address on its tag was located within South Central Los Angeles, a high crime area as indicated above. He also noted that the telephone number was not completed on the tag, but only the area code for that portion of L.A. was listed. This struck him as rather unusual because, if a person did not have a telephone, they wouldn't list anything in that section or, if they did have a telephone, once they had listed the area code they would be most likely to proceed to list the balance of their number. While the bus

was continuing its thirty-minute rest stop at Springfield, Hicks took the bag out of the luggage storage area and showed it to Adams. Adams denied that it was his bag. Hicks then asked the bus driver to allow him the opportunity to speak with the other passengers for a moment once they had reboarded the bus. The Greyhound driver complied and Hicks had the opportunity to ask each person on the bus whether the bag in question was theirs. As he did so, he displayed the bag to the passengers. None of the passengers claimed the bag. Hicks then removed the bag from the bus. As of the time that he removed it, Hicks was of the impression that Greyhound had a policy that prohibited the checking of a bag unless the person who checked it actually traveled with that bag. He believed that this was Greyhound's policy because he had learned of it from bus drivers for various Greyhound buses that stopped in the Springfield area during the period of his interdiction assignment there.[6] It was Hicks's understanding that one of the purposes for this prohibition was that shipping an "orphan" bag would be a way for someone to get free transportation of said bag. A person could purchase a ticket, check his or her bag and then take another means of transportation to the location to which the bus was traveling. At that location, the individual could claim the bag and then cancel his ticket (because it had not been used) and receive a refund. Thus, the bag would be transported at no charge, avoiding the usual freight or shipping charges for such a conveyance. Another reason for the regulation, Hicks believed, was because of safety concerns. If one were to be able to check a bag and not travel with it, it might make the prospect of putting a bomb in a bag more appealing to someone who wanted to cause harm, because the bomber would not be exposed to the risk of traveling with that bag.

After Hicks pulled the bag off the bus, he called the SPD to obtain the assistance of a

6. In fact, the manager of the Greyhound terminal in Indianapolis could not confirm that there was such a written policy. He did, however, confirm Greyhound's concern with the financial aspects of such "orphan" luggage—that is, luggage traveling on its own without an accompanying bus traveler.

drug sniffing dog.[7] On the day in question, the SPD dog, Preston, was the only dog available. The bus left the Springfield station shortly after Hicks removed the bag (sometime after 9:00 a.m., and perhaps as late as 9:15 a.m.). Preston did not arrive with his handler until approximately 10:30 that morning. Shortly after his arrival, Preston sniffed the World Traveler bag and immediately responded to it in a way that would indicate, based upon prior experiences, that illegal controlled substances were contained within the bag. Hicks then immediately compiled this information into an affidavit and presented it to a Federal Magistrate Judge in the Springfield area. A warrant was issued and a search of the bag was conducted. After discovering the contents of the bag, Hicks called ahead to his counterparts at the DEA in Indianapolis and conveyed this information to them. A plan was then made to put together a dummy bag and present it to whoever presented the claim ticket. As noted above, Ward turned out to be the unlucky claimant.

### III. Conclusions of Law

The key to the resolution of this case revolves around the manner in which Ward's World Traveler bag is classified. Is it most like a piece of luggage accompanying a traveler as was the case in *United States v. Place*, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983), or is it more like a package traveling via the United States mail such as considered in *United States v. Van Leeuwen*, 397 U.S. 249, 90 S.Ct. 1029, 25 L.Ed.2d 282 (1970)? Resolution of this question is essential to any determination of whether the detention of Ward's bag was or was not reasonable.

In *Place*, the behavior of a traveler awaiting a flight from Miami to New York raised the suspicions of law enforcement agents at the Miami airport. Said individual was not detained in Miami, but authorities there notified DEA agents in New York of their suspicions. Upon his arrival in New York, the traveler was questioned and his luggage was seized for further inspection. The luggage was then transported to another airport for a "sniff test" by a trained narcotics detection dog; the dog reacted positively to the two bags. Approximately ninety minutes elapsed between the detention of the luggage and the positive "sniff test". 462 U.S. at 698–99, 103 S.Ct. at 2640.

The Court first recognized an exception to the warrant requirement for seizures of property to allow brief warrantless detentions of personal property on the basis of a "reasonable, articulable suspicion, premised on objective facts, that [said property] contains contraband or evidence of a crime." *Place*, 462 U.S. at 702, 103 S.Ct. at 2642. However, the Court went on to hold that the seizure in that case was too long and too intrusive to be considered "reasonable" under the Fourth Amendment. *Id.* at 709–10, 103 S.Ct. at 2645.

In finding that, under the circumstances of the case, the ninety minute warrantless seizure exceeded the bounds of constitutional reasonableness, the Court noted that, although the detention of a traveler's luggage was less intrusive than the detention of the traveler himself, it was only minimally less intrusive. The Court stated:

> The precise type of detention we confront here is seizure of personal luggage from the immediate possession of the suspect for the purpose of arranging exposure to a narcotics detection dog. Particularly in the case of detention of luggage within the traveler's immediate possession, the police conduct intrudes on both the suspect's possessory interest in his luggage as well as his liberty interest in proceeding with his itinerary. The person whose luggage is detained is technically still free to continue his travels or carry out other personal activities pending release of the luggage. Moreover, he is not subjected to the coercive atmosphere of a custodial confinement

---

7. In 1992, Hicks directed his drug interdiction activities at the Springfield bus station toward four different buses traveling eastbound from narcotics source states at various times each day, five days a week. The DEA does not possess any drug-sniffing dogs of their own; thus, whenever Hicks was confronted with a situation warranting the use of such a dog, he was required to request the services of one of only two such dogs located in the Springfield area from the law enforcement agency which controlled them—*i.e.*, either the Missouri Highway Patrol or the SPD.

or to the public indignity of being personally detained. Nevertheless, such a seizure can effectively restrain the person since he is subjected to the possible disruption of his travel plans in order to remain with his luggage or to arrange for its return. Therefore, when the police seize luggage from the suspect's custody, we think the limitations applicable to investigative detentions of the person should define the permissible scope of an investigative detention of the person's luggage on less than probable cause.

*Place,* 462 U.S. at 708–09, 103 S.Ct. at 2645. In addition to finding that the length of the detention was too long, the Court also found that the agents failed to diligently pursue their investigation and failed to adequately inform the traveler regarding the disposition of his luggage and where and how it would be returned to him. *Id.* at 709–10, 103 S.Ct. at 2645. The Court found that all of these factors weighed in favor of a finding that the seizure in question was constitutionally impermissible. *Id.*

*Van Leeuwen,* on the other hand, involved two packages being mailed from Washington state to locations in California and Tennessee. The return addresses on the packages aroused the suspicion of a postal inspector and further investigation revealed that the addresses were both under investigation for trafficking in illegal coins. The packages were retained at the point of mailing until a customs official obtained a warrant to search the packages. The defendant was thereafter prosecuted for illegal importation of gold coins. 397 U.S. at 249–50, 90 S.Ct. at 1031. Twenty-six and one half hours passed between the time the packages were mailed and the search warrant was obtained and an additional two and one half hours elapsed before the warrant was executed. *Id.* at 253, 90 S.Ct. at 1032–33.

The defendant argued that the twenty-nine hour delay between mailing and search was constitutionally unreasonable, rendering the search invalid. *Van Leeuwen,* 397 U.S. at 252, 90 S.Ct. at 1032–33. The Court held:

No interest protected by the Fourth Amendment was invaded by forwarding the packages the following day rather than

the day when they were deposited. The significant Fourth Amendment interest was in the privacy of this first-class mail; and that privacy was not disturbed or invaded until the approval of the magistrate was obtained....

We only hold that on the facts of this case—the nature of the mailings, their suspicious character, the fact that there were two packages going to separate destinations, the unavoidable delay in contacting the more distant of the two destinations, the distance between Mt. Vernon and Seattle—a 29–hour delay between the mailings and the service of the warrant cannot be said to be 'unreasonable' within the meaning of the Fourth Amendment.

*Id.* at 253, 90 S.Ct. at 1032–33.

The instant case does not present a situation identical to that found in either *Place* or *Van Leeuwen.* Ward argues that this case is most like *Place* because it involves a piece of luggage being transported on a common passenger carrier. However, as will be discussed below, to find that this case is most closely akin to a passenger traveling with his or her luggage, rather than that of a parcel being transported via a common carrier, would be to fixate upon form over substance.

■ Before proceeding further, the court must first consider whether Hicks's detention of Ward's bag pending the "sniff test" was based upon a "reasonable, articulable suspicion, premised on objective facts, that [Ward's bag] contain[ed] contraband or evidence of a crime." *Place,* 462 U.S. at 702, 103 S.Ct. at 2642. "There is no 'litmus test' for evaluating reasonable suspicion; rather, each instance of police conduct must be judged for reasonableness 'in light of the particular circumstances.'" *United States v. Edwards,* 898 F.2d 1273, 1277 (7th Cir.1990) (quoting *Terry v. Ohio,* 392 U.S. 1, 21, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968)). The detention by Hicks easily satisfies this portion of the analysis.

■ The facts known to agent Hicks at the time he detained Ward's bag must be viewed in light of agent Hicks's twenty-plus years of experience as a DEA agent and his five years of experience in drug interdiction.

Hicks had also been assigned to the Los Angeles area and was familiar with drug activity there. Additionally, Hicks had worked at drug interdiction for several months in the Springfield, Missouri area and specifically at the Springfield bus stop, where, on a number of occasions, he had discovered narcotics in similar "orphan" luggage. It must also be remembered that, at the time Hicks began his search of the luggage compartment of the bus, he had just arrested an individual traveling on said bus who was in possession of illegal narcotics.

■ In light of this experience, Hicks was presented with a bag, checked as personal luggage in the luggage compartment of the LA Express, which no passenger on the bus would claim. Hicks was of the belief that such a circumstance violated a policy of the bus line that a passenger must travel with his or her checked baggage.[8] Hicks also noted that the "orphan" bag had been shipped from a source city for narcotics and from a particularly high crime area of said city. Additionally, the tag on the suitcase bore an area code but no telephone number, which further raised Hicks's suspicions as noted above. Given Hicks's training and experience, the above articulated facts are a wholly sufficient basis to support Hicks's reasonable suspicion that the bag in question was likely to contain drugs.

Having found that the initial detention of the bag was supported by Hicks's reasonable, articulable suspicion that the bag contained contraband, the court must now turn to the heart of the Defendant's argument—*i.e.*, that, regardless of whether the initial detention was valid, the delay in obtaining a "sniff test" of the luggage rendered the detention of the bag unreasonable in violation of the Fourth Amendment. To address this argument, the court must return to its consideration of the Defendant's argument that this case is controlled by the Supreme Court's decision in *Place*.

■ Because Hicks made an attempt to determine whether the owner of the World Traveler bag was on the bus, and because Ward has admitted to not traveling on the bus at all, the Defendant cannot be heard to argue that this case is identical to one where a traveler is separated, by police, from a bag with which he or she had been traveling. Rather, Ward attempts to analogize this case to a situation where the bus line was attempting to reunite a traveler with a piece of lost luggage. Essentially, Ward argues that Hicks could not have known that Ward had merely shipped the bag like a piece of freight. For all Hicks knew, the bag could merely have become separated from its owner and the bus line was merely attempting to reunite the bag and its owner.

The major flaw in this argument is that, if a traveler has become separated from his bag, the interruption in his or her travel plans with which *Place* was so concerned has already occurred independent of the actions of any law enforcement agency. Accordingly, said traveler has ceased to expect to

---

8. The Defendant makes much of the fact that the terminal manager for the Indianapolis Greyhound station testified that he knew of no written policy of the bus line requiring a passenger to travel with his or her checked luggage. This is essentially immaterial to the instant inquiry for three reasons. First, even assuming that no such written policy exists, the fact that numerous bus drivers with whom Hicks came into contact acted as though such a policy did exist may have created a *de facto* policy requiring a passenger to travel with his or her luggage. Second, even if such a policy does not exist, the evidence adduced indicates that Hicks actually believed that such a policy existed and the court finds that such a belief on his part was reasonable in the circumstances. A reasonable belief is sufficient to support a reasonable, articulable suspicion, even if such belief is premised upon a mistake of fact. *See, e.g., United States v. Ornelas–Ledesma,* 16 F.3d 714, 718 (7th Cir.1994) ("A mistaken premise can furnish grounds for a *Terry* stop, if the officers do not know that it is mistaken and are reasonable in acting upon it."); *United States ex rel. Kirby v. Sturges,* 510 F.2d 397, 400–01 (7th Cir.), *cert. denied,* 421 U.S. 1016, 95 S.Ct. 2424, 44 L.Ed.2d 685 (1975). Hence, even if mistaken, the court concludes that Hicks reasonably relied upon the existence of the policy in question in formulating the suspicion necessary to detain Ward's bag. Finally, even if it were to be found that it was totally improper for Hicks to rely upon the policy in question in forming a reasonable, articulable suspicion that Ward's bag contained contraband, the court concludes that there was a sufficient evidentiary basis, independent of Hicks's belief in the policy in question, to sustain Hicks's reasonable, articulable suspicion that Ward's bag contained contraband.

arrive at his or her destination at the same time as their luggage. While the traveler might expect the bus line to make every effort to reunite him or her with their lost luggage at the earliest opportunity, the traveler has no expectation that said event will occur at any particular time. Consequently, one of the major concerns in *Place*—*i.e.*, the extent of the intrusion upon the possessory interest of the traveler—is simply not present, even under the Defendant's hypothetical scenario.[9]

Additionally, all of the Defendant's hypothetical situations aside, the fact remains that Ward placed the World Traveler bag upon the LA Express without any intention of accompanying the bag to Indianapolis. Aside from the fact that Ward may have been able to ship the bag for free as described above, he, in effect, treated the bag as a piece of freight rather than as a piece of personal luggage accompanying him on his journey. To create a heightened privacy interest in short-term detentions of the bag via some hypothetical fallacy that someone "may" have been traveling with the bag or the bag "may" have been lost when the fact remains that no one was ever traveling with the bag in question would stretch the limits of the Fourth Amendment beyond their breaking point.[10]

Viewed in this light, Ward's World Traveler bag was more like a piece of freight being transported by a common carrier than a piece of luggage accompanying a traveler on his or her journey. As such, the situation here is much like that faced by the First Circuit in *United States v. LaFrance*, 879 F.2d 1 (1st Cir.1989).

In *LaFrance*, police, on the basis of a tip, had informed Federal Express officials that they suspected that the defendant was receiving narcotics shipped from Florida via Federal Express and had requested that said officials inform the police the next time a package arrived for the defendant from Florida. Such a package arrived, the police were notified, and the package was detained for several hours before a drug-sniffing dog reacted positively to the package. *LaFrance*, 879 F.2d at 2–3.

The defendant moved to suppress the evidence obtained from the package on the ground that the length of the detention of the

9. It is essential to have a clear understanding of the constitutional interest that the Defendant argues is at issue in this case. Although some sort of possessory interest is always implicated in the detention of an item, *Van Leeuwen* focused upon the *privacy* interest in stating that "[t]he significant Fourth Amendment interest was in the privacy of this first class mail; and that privacy was not disturbed or invaded until the approval of the magistrate was obtained", thus, no constitutional violation occurred. 397 U.S. at 253, 90 S.Ct. at 1032. Conversely, *Place* focused upon the *liberty* interest of the traveler when the Court stated:

Particularly in the case of detention of luggage within the traveler's immediate possession, the police conduct intrudes on both the suspect's possessory interest in his luggage as well as his liberty interest in proceeding with his itinerary. The person whose luggage is detained is technically still free to continue his travels or carry out other personal activities pending release of the luggage. Moreover, he is not subjected to the coercive atmosphere of a custodial confinement or to the public indignity of being personally detained. Nevertheless, such a seizure can effectively restrain the person since he is subjected to the possible disruption of his travel plans in order to remain with his luggage or to arrange for its return.
462 U.S. at 708, 103 S.Ct. at 2645.

In the instant case, no argument has been made that the Defendant's privacy interest in the bag has been violated, and none may be made because Ward's bag was not opened until Hicks had obtained a search warrant based upon probable cause. Consequently, Ward's argument must be premised upon some hybrid possessory/liberty interest. However, such a claim must fail because, as noted *infra*, Ward's interest in the bag is significantly more attenuated than if he had been traveling on the bus along with his bag. Thus, no possible violation of any of Ward's constitutionally protected interests arose to the level of a violation of his Fourth Amendment rights.

10. Of course, the court must review the propriety of the detention in question considering only the information available to the law enforcement officer at the time he detained Ward's bag. In this light, the facts do not support the hypothetical posed by the Defendant. Rather, given what Hicks knew at that time and Hicks's prior experience, the most reasonable inference by Hicks at the time the bag was detained was that said bag had been placed on the bus by an individual who did not board the bus. There is no evidence to support an inference that the bag was rushing to meet a traveler from whom it had become separated. The court need not adopt such an unreasonable inference.

package pending the "sniff test" had been unreasonable in light of *Place*. The court first found that, although Federal Express would generally deliver packages shipped to the defendant by around 11:00 a.m., because Federal Express had only contractually agreed to deliver the package sometime "before noon", the "detention of the parcel did not, indeed could not on these facts, intrude on [the defendant's] possessory interest until the appointed hour, noon, had come and gone." *LaFrance*, 879 F.2d at 7.

Applying this reasoning to the case at bar would lead to the conclusion that there was no delay of the bag in the instant case, whatsoever. Greyhound had not contractually agreed to have Ward's bag in Indianapolis until the bus's arrival in Indianapolis at 6:25 p.m. By that time, the bag had been subjected to a warranted search and the DEA had arranged for a "dummy" bag to be available in Indianapolis, should someone appear to claim the bag in question. While the court finds that it is not necessary to adopt this portion of the court's opinion in *LaFrance*, it does note that Ward's access to the bag could never have been delayed until 7:00 p.m. on the day in question—the time at which he first presented his claim check for the bag at the bus station in Indianapolis. All of the Defendant's protestations as to how much the bag would have been delayed had no contraband been discovered are really nothing more than the purest speculation.[11]

■ Having found that the detention of the package did not even begin until noon, the *LaFrance* court went on to find that the detention of the package after that time was not violative of the Constitution. In so doing, the court considered "three presumptively-relevant factors" gleaned from *Place:* "(1) investigatory diligence, (2) length of detention, and (3) information conveyed to the suspect." *LaFrance*, 879 F.2d at 7.

The court first found that the officers involved pursued the search of the item with due diligence once it had been detained. *LaFrance*, 879 F.2d at 8. This is so, even though there was an almost four hour delay between the police learning of the package and their arranging for a dog to conduct the requisite "sniff test". Additionally, a portion of this delay was caused by the fact that the case officer wanted to be present for the search and he waited two and one half hours after learning of the package for his wife to return home and care for their infant child before departing for the site at which the "sniff test" was to be conducted. The "sniff test" did not begin until 1:15 p.m., an hour and fifteen minutes after Federal Express had contractually agreed to deliver the package to the defendant. *Id.* at 3. The court stated that "[d]iligence, we think, is fairly characterized by steady, earnest, energetic, and attentive application and effort toward a predetermined end. That test was satisfied in this case; the officers acted with reasonable diligence under the circumstances." *Id.* at 8 (citation omitted).

The court also found that the officers had satisfied the element of timeliness. After considering the effects of both *Place* and *Van Leeuwen*, in finding that the one hour and forty-five minute delay did not violate the Fourth Amendment, the court stated:

> Whereas FedEx's noon delivery schedule requires that we apply a somewhat stricter time constraint in this case ... we must nevertheless balance length of detention not against an amalgam of possessory and liberty interests, but only against dispossession of the contract-based interest in timely delivery. And we note that such a contractual interest has not yet proved to be a decisive counterweight to the public's interest. So weighed, neither the deten-

---

11. The Defendant suggests that, had nothing been found as a result of the "sniff test" of the bag, said bag would have been placed on the next bus through Springfield headed for Indianapolis. This would have resulted in a delay of approximately three hours and fifteen minutes (the next bus through Springfield arrived there at 11:20 a.m. and was to arrive in Indianapolis at 9:40 p.m.). The court notes that even if this period were found to be the ultimate extent of the delay Ward might have experienced, such would not alter the court's analysis that, under the circumstances of this case, a delay of that length was not unreasonable under the Fourth Amendment.

tion's duration nor its intrusiveness seem disproportionate in this instance.

*LaFrance,* 879 F.2d at 9 (citations omitted).

Finally, the court found that the third factor—information conveyed to the suspect—was not really relevant to the case. The court noted that *Place* recognized such a factor because of the overarching concern with the extent to which detention of a traveler's luggage would interfere with said traveler's ability to continue on his or her journey. The court stated:

[T]he underlying rationale of *Place* itself suggests that the information factor is likely irrelevant to seizures from third parties. If accurate, information about where luggage has been taken, for how long, and how it may be returned, is important largely because it affects a liberty interest (the possessor's ability to travel); misinformation can obviously cause delay, disruption of routing and timing, or general inconvenience. Where the intrusion implicates only a possessory interest, however, that interest is usually unaffected by the place at which the seized article is kept and what one is told, so long as the object's condition is undisturbed. Only information about how long the detention may last is relevant, because only such information relates to the length of dispossession.

*LaFrance,* 879 F.2d at 9. The court went on to find that the government was under no obligation to inform the defendant that his package would be delayed, even after the appointed hour for its delivery had passed. *Id.* at 9–10.

■ The court finds the case at bar to be remarkably analogous to the situation in *LaFrance.* Because Ward chose not to trav-

el with his bag, it is more similar to a piece of freight than to a piece of luggage traveling on the same conveyance as its owner. However, because Greyhound was expected to deliver the bag to Indianapolis on a certain date and time, Ward's bag is more similar to the Federal Express package in *LaFrance* than the mail considered in *Van Leeuwen.* Accordingly, the court will consider the three factors articulated in *Place* in a manner similar to that adopted by the court in *LaFrance.*[12]

■ With regard to the first element, the court finds that the actions of agent Hicks and the other officers involved satisfy the requirements of due diligence. The Defendant's primary objection on this point is that agent Hicks, assuming he expected to find narcotics on the bus, should have had a drug-sniffing dog standing by to "sniff test" the bag prior to the departure of the bus. While this certainly would have minimized the detention of the bag, and would have been the appropriate *modus operandi* in a perfect world, agent Hicks's actions in the instant case were eminently reasonable in light of the circumstances with which he was faced.

The DEA is not in possession of any drug-sniffing dogs of their own. Accordingly, the DEA must rely upon dogs controlled by other agencies to assist in their drug interdiction operations. Only two such dogs are located in the Springfield, Missouri area,[13] one belonging to the Missouri Highway Patrol and the other to the SPD. After he had detained Ward's bag, Hicks immediately placed a call to the dog handler for the SPD and asked her to bring her dog to the DEA office near the bus station.[14] There is no

---

**12.** The Defendant vociferously argues that this case is more analogous to the decision of the Fifth Circuit in *United States v. Cagle,* 849 F.2d 924 (5th Cir.1988), than it is to *LaFrance.* However, *Cagle* involved the detention of a traveler's luggage, which precluded said luggage from arriving at the traveler's destination at the same time as the traveler as it would have absent the detention. The *Cagle* court found the situation before them to be virtually identical to the situation in *Place* and found that the one hour and thirty minute detention of the luggage was too intrusive upon the interests of the traveler to qualify as reasonable under the Fourth Amendment. *Cagle,* 849 F.2d at 926–27. Because the

instant case is much less similar to *Place* than was *Cagle,* the court declines the Defendant's invitation to hold that *Cagle* defines this case.

**13.** The 1990 census found that there were approximately 264,000 residents in the greater Springfield, Missouri metropolitan area. UNITED STATES BUREAU OF THE CENSUS, 1995 STATISTICAL ABSTRACT OF THE UNITED STATES 42 (115th ed. 1995).

**14.** Hicks testified that he had checked with the dog handler for the Missouri Highway Patrol and had been informed that said handler would be unavailable on the day in question.

evidence to indicate that the SPD dog handler did not expeditiously transport Preston to the DEA office to conduct the "sniff test". As noted previously, the evidence reflects that Preston arrived at Hicks's office approximately one hour after the call was placed, that the "sniff test" began soon after Preston arrived and that Preston reacted positively to the suitcase indicating the presence of narcotics. After this point, the Defendant does not contest the fact that sufficient probable cause existed to obtain a warrant to search the suitcase or that said warrant was obtained prior to the search being conducted.

The Defendant's main challenge to the diligence of Hicks's efforts regards whether Hicks should have had a drug-sniffing dog present at the time the bus arrived in Springfield. The evidence shows that, as often as possible, Hicks does request that such a dog be available to him to assist his interdiction efforts at the bus station. The evidence also reveals that Hicks has attempted to determine a pattern of drug trafficking through the station and has found no discernable pattern of activity. Hicks directs his efforts at the bus station primarily toward four buses which arrive each day traveling eastbound from drug source states in the western United States. This means that Hicks focuses upon twenty buses passing through Springfield each week at various times throughout each day. Hicks also indicated that his research did not pinpoint any particular bus route or any particular day of the week that drug smuggling activity would be more likely.

Two drug-sniffing dogs in a city of a quarter million people cannot be in more than two places at any one time. One would expect that the primary efforts of said dogs would be to their primary agencies—the Missouri Highway Patrol and the SPD. Hicks's use of either dog was only by request and at the convenience of the department involved. Hicks had no authority to order that a dog be made available to him, and given the limited number of animals, it is likely that there are times when no drug-sniffing dog is available in the Springfield area at all. Given all of these factors, it was not unreasonable for Hicks to not have a drug-sniffing dog at the

bus station on the day in question. Hicks satisfied the dictates of due diligence by requesting that a dog be made available almost immediately after Ward's bag was detained. *See, e.g., United States v. Borys,* 766 F.2d 304, 314 & n. 3 (7th Cir.1985), *cert. denied,* 474 U.S. 1082, 106 S.Ct. 852, 88 L.Ed.2d 893 (1986). Furthermore, the SPD exercised due diligence in providing Preston to Hicks to conduct the "sniff test" within an hour of the request being made. The court finds that the first element of the analysis weighs heavily in favor of the reasonableness of the detention in question.

The second element of the analysis—the length of the detention—also weighs in favor of the validity of the detention. There are three possible durations for the court to consider. The first would be for the court to adopt the reasoning from *LaFrance* and hold that no delay whatsoever occurred because the initial detention, the "sniff test" and the warranted search all occurred prior to the time (6:35 p.m.) at which Ward's possessory interest in the bag would obtain. *See LaFrance,* 879 F.2d at 7–9. The second would be the hour to hour and fifteen minutes which elapsed between the time Hicks took Ward's bag from the bus and the time that Preston arrived and conducted the "sniff test". Finally, the Defendant suggests that the period of detention which should be considered is the three hour and fifteen minute delay which would have resulted to Ward had the "sniff test" proved negative and the bag been placed on the next bus through Springfield bound for Indianapolis. *See supra* note 11. However, even assuming the delay suggested by the Defendant to be correct, the court finds that the length of the detention in the instant case was not unreasonable.

The court has already found that it would be patently unreasonable, given the circumstances of this case, to have required Hicks to have a drug-sniffing dog present on every occasion in which he inspected an incoming bus. Absent that, the only two options available to Hicks, when presented with a bag for which he has a reasonable, articulable suspicion that contraband is inside, would be to: (1) remove the bag from the bus, obtain a dog to conduct a "sniff test", and then either

obtain a warrant to search the bag or place the bag upon the next bus passing through Springfield bound for the destination of the bag (this, of course, is the method adopted by Hicks in the instant case), or (2) allow the bag to continue on its journey and interdict it at some later point along the way. The Defendant contends that the latter approach is the only one which satisfies the dictates of the Constitution, however, there are a number of reasons why that method was neither practical nor required in this case.

First, Hicks testified that there is no DEA unit that conducts interdiction at the bus terminal in St. Louis. At St. Louis, the bag was to be transferred to another bus to proceed to Indianapolis, thereby presenting a number of opportunities for the bag to slip from the grasp of law enforcement personnel. Second, unlike the cargo compartment of an airplane, Hicks could not be guaranteed that there would be no access to the luggage compartment of the bus until it reached its destination.[15] Therefore, had the true owner of the bag been on the bus and merely remaining silent when Hicks sought the bag's owner, it may have been possible for said individual to get off the bus at its next stop, obtain the bag and elude capture. It is for this reason that Hicks never allowed a parcel suspected to contain drugs to continue on its journey prior to being "sniff tested". Finally, the cases in which courts have found that the least intrusive approach would be to allow the bag to proceed on its journey and then have a drug-sniffing dog available at the destination have generally involved air travel and a traveler whose journey would be interrupted if the bag were not allowed to proceed on its way. Neither of these circumstances is present in the case at bar. Accordingly, the court finds that the only reasonable option available to Hicks, once he had acquired

a reasonable, articulable suspicion that Ward's bag contained contraband, was to detain the bag in his possession until he could obtain a "sniff test" of the bag.

On that basis, as noted, Hicks proceeded with due diligence in obtaining the "sniff test" of Ward's bag. Thus, even assuming the Defendant's worst-case scenario, the bag would have been placed on the next bus through Springfield bound for Indianapolis. Given the circumstances of this case, the resulting three hour and fifteen minute delay of the bag in arriving at the terminal in Indianapolis is one which society is willing to accept as reasonable under the Fourth Amendment. Accordingly, the second element of the analysis also weighs in favor of the reasonableness of the detention in question.

Finally, as noted by the court in *LaFrance*, the third element—the information conveyed to the suspect—is particularly irrelevant in the present case.[16] Given the fact that Ward failed to indicate a complete telephone number on his luggage tag, the DEA had no way to contact Ward prior to his arrival at the Indianapolis bus station to claim his bag. Ward was arrested soon after he presented his claim check, at which time he was fully informed of the interruption in the journey of his bag. This is simply not a case where the DEA's failure to inform Ward concerning the delay of his bag exacerbated any intrusion into Ward's protected interests.[17] *See, e.g., Place,* 462 U.S. at 710, 103 S.Ct. at 2646. Consequently, all three of the *Place* factors weigh in favor of a finding that Hicks's brief detention of Ward's bag prior to obtaining a "sniff test" and the resulting search warrant was not unreasonable for purposes of the Fourth Amendment. Accordingly, the Defendant's motion to suppress will be **DE-NIED.**

---

**15.** The court infers that the luggage compartment is subject to being opened at each stop of the bus as various passengers board and depart the bus.

**16.** The court notes that the information referred to in this element is information regarding the disposition of Ward's bag while in the hands of the authorities. This element does not refer to information Ward received from Greyhound when he telephoned the terminal on several oc-

casions to inquire whether the LA Express would be arriving on time. During such inquiries, Ward remained effectively incognito and the information provided to him was essentially correct.

**17.** Other than the fact that the court assumes that Ward would not have appeared to claim the bag had he been informed that the DEA was waiting to arrest him if he did so.

## IV. Conclusion

The court finds that Hicks's detention of Ward's bag pending a drug "sniff test" was based upon a reasonable, articulable suspicion that said bag contained contraband. Furthermore, given the fact that Ward's bag was more like a piece of freight being transported by a common carrier than a piece of luggage accompanying a traveler, the court finds that Hicks exercised all necessary diligence in obtaining the "sniff test" and the resulting search warrant and that the period of the detention of the bag to conduct said activities was not unreasonable. Accordingly, the court finds that the detention of Ward's bag was constitutionally permissible and that the Defendant's motion to suppress the bag and the evidence resulting from its search should be **DENIED.**

ALL OF WHICH IS ORDERED.