UNITED STATES of America,
Appellant,

v.

Michael Francis LaFRANCE, et al.,
Defendants, Appellees.

No. 88–2244.

United States Court of Appeals,
First Circuit.

Heard May 2, 1989.

Decided July 17, 1989.

Margaret D. McGaughey, Asst. U.S. Atty., with whom Richard S. Cohen, U.S. Atty., and Nicholas M. Gess, Asst. U.S. Atty., were on brief, for U.S.

Nathan P. Diamond, for defendant, appellee Mark Anthony Grimmel.

Richard S. Emerson, Jr., for defendant, appellee Michael Francis LaFrance.

Before CAMPBELL, Chief Judge, SELYA, Circuit Judge, and GRAY,* Senior District Judge.

SELYA, Circuit Judge.

It should not be surprising that criminal enterprises, like lawful ones, have adapted their operating procedures to the ever quickening pace of modern life. As legitimate commerce soars on the wings of technological advancement, so does illegitimate commerce; as permitted businesses luxuriate in the enhanced sophistication of a service-oriented economy, so do proscribed businesses. A rising tide lifts all boats.

The case before us posits important and little-considered questions: To what extent may the nation's interest in stanching the flow of drugs impinge upon the newfound conveniences of the modern era? When does a seizure and detention of property from what are now the whitewater rapids of commerce offend the federal Constitution? That these questions are no longer rhetorical is amply illustrated by the sequence of events underlying this case, culminating in the seizure and detention of a cocaine-laden Federal Express package. Traffic in drugs, already "highly organized and conducted by sophisticated criminal syndicates," *United States v. Mendenhall*, 446 U.S. 544, 562, 100 S.Ct. 1870, 1881, 64 L.Ed.2d 497 (1980) (Powell, J., concurring), has now fully coopted the methods and means of more conventional commerce. When contraband absolutely, positively has to get there overnight, the incessant commercial messages which inundate our society's channels of communication "guarantee" felons, like other entrepreneurs, prompt delivery. The tale follows.

I

An indictment was returned in the United States District Court for the District of Maine charging defendants-appellees Michael LaFrance and Mark Grimmel with conspiracy to possess cocaine, intending to distribute it, committing that substantive offense, and aiding and abetting commission of the offense. *See* 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B), 846; 18 U.S.C. § 2. The basic facts are largely undisputed. We summarize them.

In the fall of 1985, Lewiston, Maine police received anonymous calls claiming that LaFrance was selling cocaine and marijuana received via Federal Express (FedEx) from Florida. Grimmel was said to be the consignor. The caller(s) said that LaFrance's father, Frank, was aware of his son's illicit trafficking, and that LaFrance stored cocaine at his father's house. The police did little or nothing with this intelligence until March of 1986. They then determined where in Lewiston LaFrance lived and learned that he had sent and received weekly FedEx packages to and from Florida since at least the previous November. Notwithstanding this new information, the investigation proceeded at a somewhat somnolent gait.

* Of the Central District of California, sitting by designation.

Eventually, the sleeping giant awoke. Sometime before 9:00 a.m. on June 5, a Thursday, FedEx officials alerted the Lewiston police, as they had recently been requested to do, that a package from Grimmel had arrived at the carrier's Portland facility. It was addressed to Frank LaFrance at his Lewiston residence. Not surprisingly, the police considered the package suspect. The FedEx manager offered to open the package on his own authority, but the lawmen demurred. The case officer, Avery, conferred immediately with his superior, Lt. Saucier. Because they were unsure of the legal landscape, and wary of Fourth Amendment minefields, the policemen asked FedEx at roughly 9:03 a.m. to hold the package pending further word.

Saucier then sought advice from the Maine State Police in the person of Agent MacMaster. MacMaster set about locating a drug-sniffing dog. By 9:20 a.m., MacMaster had tracked down a handler, Trooper Gallagher, and dog (Solomon), at Gallagher's home in Gray, Maine (a community situated midway between Portland and Lewiston). MacMaster suggested that the officers meet in Lewiston to conduct the drug sniff because Lewiston was the parcel's stipulated destination and seemed reasonably convenient for all concerned. Avery thereupon instructed FedEx's local manager, Attanas, to send the package to Lewiston in the normal course, but to deliver it to the police department after the carrier's remaining Lewiston delivery commitments were fulfilled.

In Lewiston, FedEx guarantees overnight delivery by noon of the following day. The officers understood that the package would arrive at the stationhouse around then, or soon after. Avery was off duty, caring for his infant son. He tried, but failed, to make alternative child-care arrangements. Eventually, his wife returned home, freeing him for the work at hand. Although the record is less than precise, the most logical inference is that Mrs. Avery did not return until 11:28 a.m., when Avery called Gallagher (who was also off duty) and asked him to visit the Lewiston police station by 1:00 p.m., with Solomon in tow.

As events transpired, the package arrived at the stationhouse at 12:45 p.m. Avery was already there. Gallagher arrived about 1:00 p.m., having accidentally gone first to police headquarters in a neighboring community. The sniff test began about 1:15 p.m. and ended within the hour. The test was positive (or phrased in the idiom of the rite, the "canine unit ... alerted to the package"). Appellees concede that the successful sniff test added a sufficient quantum of evidence to establish probable cause for issuance of a warrant and inspection of the seized parcel's contents. When searched, the package was found to contain a substantial quantity of cocaine.

At the suppression hearing, LaFrance testified that he expected to receive the package by 11:00 a.m., or 11:15 a.m. at the latest, based upon his prior experience. When 11:00 a.m. came and went with no delivery, LaFrance telephoned Grimmel. Grimmel assured him the missive had been sent and immediately asked FedEx to trace it. LaFrance called FedEx directly; the company told him that the matter would be checked. Instead of waiting for a return call, LaFrance tried again shortly before noon, only to have the earlier exchange repeated. On his third call, between 1:00 p.m.–1.30 p.m., an understandably impatient LaFrance was informed that a trace had been instituted but that FedEx did not know the package's exact whereabouts. A FedEx employee also told LaFrance that the courier had tried to deliver the package, but that no one had been at home. LaFrance neither asked nor received the name(s) of the FedEx staffers with whom he spoke during the three calls.

From that point forward, LaFrance called approximately every half-hour until late afternoon. At roughly 5:00 p.m. FedEx made an apopemptic call to LaFrance and arranged for him to meet the delivery truck. At the designated rendezvous, LaFrance was arrested upon taking possession of a dummy package. Grimmel's apprehension followed, as did the indictment.

**4**

Defendants moved to quash evidence anent the package and its contents.[1] The district court granted the motions, holding that the authorities had failed to minimize the intrusiveness of the detention, thus violating defendants' constitutional rights. *United States v. LaFrance,* 702 F.Supp. 350, 355 (D.Me.1988). The government appeals under 18 U.S.C. § 3731. We reverse.

## II

### A

■ The fourth amendment safeguards "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," and accomplishes its objective by providing protections of probable cause and particularity. A sealed package entrusted to a private parcel service is "unquestionably an 'effect' within the meaning of the Fourth Amendment." *United States v. Jacobsen,* 466 U.S. 109, 114, 104 S.Ct. 1652, 1657, 80 L.Ed.2d 85 (1984). Accordingly, though "government agents may lawfully seize such a package to prevent loss or destruction of suspected contraband, the Fourth Amendment requires that they obtain a warrant before examining [its] contents...." *Id.*

■ In this case, the police seized just such a package. They did so on reasonable suspicion that it contained contraband. Hence, despite the absence of probable cause at that point, the seizure was lawful. *See United States v. Place,* 462 U.S. 696, 700–06, 103 S.Ct. 2637, 2641–44, 77 L.Ed.2d 110 (1983) (reasonable suspicion can justify brief detention of property); *United States v. Van Leeuwen,* 397 U.S. 249, 252–53, 90 S.Ct. 1029, 1032–33, 25 L.Ed.2d 282 (1970) (similar); *United States v. West,* 731 F.2d 90, 91–92 (1st Cir.1984) (similar), *cert. denied,* 469 U.S. 1188, 105 S.Ct. 956, 83 L.Ed. 2d 963 (1985). Once having seized the parcel, the officers exercised effective control over it for some five and one-quarter hours before the probable cause barrier was

scaled. Appellees asseverate, and the court below agreed, that the police did not act expeditiously enough, thus rendering the time of detention unreasonable and contaminating the fruits of the ensuing search. We are not persuaded.

### B

Ordinarily, we would afford considerable respect to the district court's findings on a suppression motion. *See United States v. Aguirre,* 839 F.2d 854, 857 (1st Cir.1988); *United States v. Figueroa,* 818 F.2d 1020, 1024 (1st Cir.1987). But, it is settled that findings of fact predicated upon, or induced by, errors of law are not entitled to the usual deference. *See United States v. Singer Mfg. Co.,* 374 U.S. 174, 194 n. 9, 83 S.Ct. 1773, 1784 n. 9, 10 L.Ed.2d 823 (1963); *Reliance Steel Products Co. v. National Fire Ins. Co.,* 880 F.2d 575, 577 (1st Cir. 1989). This is such a case.

■ Our concern with the approach adopted by the district court centers on the analytic method used in arriving at its critical finding. While the court properly acknowledged that the constitutionality of property detentions based on reasonable suspicion depends upon reasonableness under the circumstances, *LaFrance,* 702 F.Supp. at 353, the court failed to ask whether the police procedures employed in this instance were reasonable. Instead, the court chose to suggest hypothetical alternative procedures which might have lessened the detention's impact. *See, e.g., id.* at 354 ("The officers had many alternatives by which to reduce the intrusiveness of their chosen plan and no compelling reason has been offered for the choice which they made."). The result was to create a standard tantamount to requiring government agents to adopt the least intrusive means possible. In the package detention milieu, we think this was plain error.

There appears to be only one case which has adopted so high a standard in connec-

---

1. The government conceded in the district court that both sender and receiver had standing to challenge the package's detention. We accept

that concession *arguendo,* but express no opinion thereon.

tion with an object detention; with all due respect, that opinion, *United States v. Sanders*, 719 F.2d 882 (6th Cir.1983), is founded on multifaceted error. In *Sanders*, the court held that "the investigative means used [should be] 'the least intrusive means reasonably available.'" *Id.* at 887. Putting to one side that the articulated standard requires the "means" be "reasonably available" (and there was in the case before us no proof of *available* alternatives), *Sanders* discusses detention for a "sufficiently limited ... time," 719 F.2d at 887, as separate and apart from "least intrusive means reasonably available." *Id.* Thus, the court below—which seemed to say that the hypothetical alternatives were relevant to reduce the detention's intrusiveness by decreasing the detention's duration, *LaFrance*, 702 F.Supp. at 354—took a road which was different from, and went further than, *Sanders*. More troubling still, the holding of *Sanders* rests on nonexistent underpinnings: the *Sanders* panel purported to quote from, and rely on, *Place* for its analysis, *see* 719 F.2d at 886–87, but we have been unable to locate the "quoted" language anywhere in the *Place* opinion.[2] In our view, this circumstance disables *Sanders* as meaningful precedent.

Furthermore, the rationale of *Sanders*, quite apart from the vagaries of miscitation, has not withstood the march of time. In *United States v. Sharpe*, 470 U.S. 675, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985), the Court specifically rejected the hypothetical alternative approach. Chief Justice Burger wrote, albeit in a somewhat different context: "A creative judge engaged in *post hoc* evaluation of police conduct can almost always imagine some alternative means by which the objectives of the police might have been accomplished.... The question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or to pursue it." *Id.* at 686–87, 105 S.Ct. at

1575–76. *Cf. United States v. Sokolow*, — U.S. —, 109 S.Ct. 1581, 1587, 104 L.Ed.2d 1 (1989) (stop ancillary to airport luggage detention; reasonableness of officers' decision to stop suspect "does not turn on the availability of less intrusive investigatory techniques"). We believe that *Sharpe* is a portent for this case and that its logic applies.

The district court's erroneous view of the proper level of scrutiny in a property detention case is understandable. The authorities are both confused and confusing. The vast bulk of the caselaw deals with luggage detention, usually at an airport. *See, e.g., Place*, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110; *United States v. Regan*, 687 F.2d 531 (1st Cir.1982); *United States v. Jodoin*, 672 F.2d 232 (1st Cir.1982); *United States v. Pantazis*, 816 F.2d 361 (8th Cir. 1987); *United States v. Alpert*, 816 F.2d 958 (4th Cir.1987); *United States v. Borys*, 766 F.2d 304 (7th Cir.1985), *cert. denied*, 474 U.S. 1082, 106 S.Ct. 852, 88 L.Ed.2d 893 (1986); *United States v. Licata*, 761 F.2d 537 (9th Cir.1985); *United States v. Puglisi*, 723 F.2d 779 (11th Cir.1984); *Sanders*, 719 F.2d 882; *United States v. Wallraff*, 705 F.2d 980 (8th Cir.1983). Yet, the case at bar is cut from a different cloth than the luggage detention cases. The district court believed the difference to be relatively inconsequential and the cases "highly analogous" because FedEx's assurance of rapid delivery created a set of expectations "similar to [those of] travelers who expect their luggage to be available to them at a certain time." *LaFrance*, 702 F.Supp. at 353. We think the analogy much more tenuous.

While a speedy, set delivery schedule influences one's possessory interests in property, the analogy pursued by the court below is inapt because luggage detention, typically, implicates dual concerns. That is to say, detention of a traveler's suitcase not only interferes with his possession of

---

**2.** The exact language is: "the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Sanders*, 719 F.2d at 887 (purporting to quote *Place*, 103 S.Ct. at 2644). Our research suggests that the quotation is from *Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 1325, 75 L.Ed.2d 229 (1983) (plurality opinion). *Royer* antedated *Place* and involved an altogether different question: whether "Royer was being illegally detained at the time of his purported consent to a search of his luggage." 460 U.S. at 493, 103 S.Ct. at 1321.

the bag itself, but also impinges on a "liberty interest in proceeding with his itinerary." *Place*, 462 U.S. at 708, 103 S.Ct. at 2645. In this case—as will be true, we suspect, in the ordinary commercial package case—appellees have pointed to no liberty interest accompanying their possessory interest. While the police are not free to dispossess an individual at will, they are subject to fewer restraining circumstances where they trammel no other recognized interest apart from that of possession alone. Consequently, the rules developed for luggage detention cases have somewhat limited applicability in matters, like this one, which involve purely possessory interests.

In a parcel detention case, as with luggage detention, reasonableness remains the focus of judicial inquiry. But, what is reasonable in one type of situation may not be reasonable in the other. Put another way, "reasonableness 'is a mutable cloud, which is always and never the same.'" *Sierra Club v. Sec'y of the Army*, 820 F.2d 513, 517 (1st Cir.1987) (quoting and paraphrasing Ralph Waldo Emerson). We must ask whether the detention, taken as a whole, or any step therein, was unreasonable. In so doing, we must be careful of the citizen's rights, and equally careful that we do not hold law enforcement to a standard akin to perfection. While a court may be able to suggest that a given course of action is constitutionally unreasonable simply by comparison with possible alternatives not chosen, attempted proof by indirection, such as was essayed by the court below, is neither efficient nor analytically compelling. Simply proving that more efficacious approaches were available does not prove that the method actually used was unreasonable. *Cf. West*, 731 F.2d at 93 ("we cannot fault the ... conduct merely because in retrospect we can envision a course of events which would have lessened the degree of intrusion on ... fourth amendment interests").

As we turn to the inquiry which confronts us, we note that an implicit assumption pervades the caselaw. We believe it is worth making explicit here: time of detention is not necessarily synonymous with, or even a reliable proxy for, intrusiveness of detention. Where inanimate objects are concerned, detention is merely the period during which government agents exercise dominion and control over the property. *See Jacobsen*, 466 U.S. at 120 & n. 18, 104 S.Ct. at 1660 & n. 18. Detention of an inanimate object is one-dimensional; it may vary *only* in length of time.[3] Intrusion, however, is two-dimensional; it "can vary both in its nature and extent." *Place*, 462 U.S. at 705, 103 S.Ct. at 2643. Indeed, an intrusion may be so insignificant as to go "unnoticed" and thus "have only a *de minimis* impact on any protected property interest." *Jacobsen*, 466 U.S. at 109, 104 S.Ct. at 1652; *cf. United States v. Veillette*, 778 F.2d 899, 903 (1st Cir.1985) (discussing intrusiveness of interference with possessory interest in premises while proprietor was under arrest, but before warrant obtained), *cert. denied*, 476 U.S. 1115, 106 S.Ct. 1970, 90 L.Ed.2d 654 (1986). Consequently, though the duration of a detention is an important consideration in evaluating the intrusiveness of a package's determent, it is neither the mirror image of unreasonableness nor the yardstick against which the suitability of police procedures must inevitably be measured. In the ordinary case, a judge will not be able to calculate whether an intrusion goes beyond the pale merely by holding a stop watch to a sequence of events.

### C

With this prelude, we turn to the facts. Appellees do not contest the reasonableness of the initial seizure, nor could they successfully do so. We are therefore required to weigh the length of the detention and its impact upon defendants' fourth amendment interests against the importance of law enforcement concerns said to justify interdiction. *See Place*, 462 U.S. at

---

**3.** Detention can, of course, be carried to the next plane if and when the detained parcel is opened. At that point, detention takes on entirely new fourth amendment dimensions, ones generally necessitating a warrant to search as a precondition.

703–05, 103 S.Ct. at 2642–43 (in luggage detention case, court must balance nature and quality of intrusion against government's interest in detention); *Borys*, 766 F.2d at 312–14 (carrying out balancing exercise). Here, one pan of the scale could scarcely be better defined: "The public has a compelling interest in detecting those who would traffic in deadly drugs for personal profit." *Place*, 462 U.S. at 703, 103 S.Ct. at 2642 (internal quotation omitted). The key ingredient which defines the other pan—appellees' possessory interest in the FedEx package—is considerably more entropic. And that interest was unweighed below.

■ We are duty bound to evaluate defendants' interest as if the package contained legitimate goods. *Jacobsen*, 466 U.S. at 114, 104 S.Ct. at 1657; *see also United States v. Dass*, 849 F.2d 414, 415 (9th Cir.1988) (employing evaluative technique). But, a possessory interest derives from rights in property delineated by the parameters of law, in this case, contract law. *Cf. Jacobsen*, 466 U.S. at 122 n. 22, 104 S.Ct. at 1661 n. 22 (expectation of privacy derives from property law and long-standing cultural expectations). On this record, the only possessory interest at stake before Thursday noon was the contract-based expectancy that the package would be delivered to the designated address by morning's end. FedEx obligated itself to no more than that. LaFrance's anticipation that he would receive the goods soon after 11 a.m., though based on earlier experiences, is irrelevant. It is hornbook contract law that where a delivery time is agreed upon, a court should not intrude to imply a (different) reasonable time for delivery. *See* J. Calamari & J. Perillo, *Contracts* 46 (2d ed. 1977). Contractually, neither appellee had grounds for complaint until the stroke of noon.

To be sure, at 9:03 a.m. the gendarmes asked FedEx to hold the package—but the record does not indicate what, if anything, that request may have meant (besides

keeping a watchful eye). At any rate, the police issued a supplemental instruction to FedEx almost immediately, telling the company to "put the package on the truck in its normal course of delivery." [4] Inasmuch as there was neither interference with the package's normal course nor frustration of appellees' contractual expectations, the prenoon "detention" had but a *de minimis* impact on a nearly evanescent possessory interest. *See Puglisi*, 723 F.2d at 786 n. 7. Thus, detention of the parcel did not, indeed could not on these facts, intrude on appellees' possessory interest until the appointed hour, noon, had come and gone.

Once noon arrived, the constitutional chemistry was altered. At that point, LaFrance had a contract-based right to possess the package, Grimmel to see it in LaFrance's hands. *See Texas v. Brown*, 460 U.S. 730, 747, 103 S.Ct. 1535, 1546, 75 L.Ed. 2d 502 (1983) (Stevens, J., concurring); *see also Jacobsen*, 466 U.S. at 113 & n. 5, 104 S.Ct. at 1656 & n. 5 (describing seizure as a "meaningful interference with an individual's possessory interest in th[e] property"). Probable cause was lacking until roughly 2:15 p.m. Thus, the police dispossessed LaFrance, and frustrated Grimmel's contractual rights, for some 135 minutes.

### D

■ Having limned the interests of the parties and the impact of the police action on those interests, we proceed to assay the reasonableness, that is, the net intrusive impact, of the police action. The existing caselaw suggests three presumptively-relevant factors: (1) investigatory diligence, (2) length of detention, and (3) information conveyed to the suspect. *See Place*, 462 U.S. at 709–10, 103 S.Ct. at 2645–46; *West*, 731 F.2d at 92. While there is some play among these factors, each has a theoretical outer limit which alone might render detention unconstitutional. *See, e.g., Van Leeuwen*, 397 U.S. at 252, 90 S.Ct. at 1032 (time). We know of

---

4. The quoted language, Record Appendix (R.A.) at 55, is excerpted from the testimony of FedEx's manager, Attanas, at the suppression hearing. *See also id.* at 58 (package would have been handled "[p]retty much in a similar way" had police not intervened). The district court's findings of fact track this testimony. *See LaFrance*, 702 F.Supp. at 351.

no sliding scale in which the intensity of legitimate police suspicion, short of probable cause, may alone compensate for too great an intrusion on possessory interests —and we decline to create one. Although the constable must be accorded flexibility to engage in a graduated response, the constitutionality of that response will always be dependent upon the circumstances of the case and the frontiers of reasonableness. *See, e.g., Place,* 462 U.S. at 709 n. 10, 103 S.Ct. at 2646 n. 10; *Van Leeuwen,* 397 U.S. at 253, 90 S.Ct. at 1032; *West,* 731 F.2d at 92; *Alpert,* 816 F.2d at 964; *Borys,* 766 F.2d at 312–13; *Puglisi,* 723 F.2d at 789–90. Furthermore, and critically in this case, the triad of factors mentioned in *Place* were developed for use in luggage detention cases; common sense insists that they be used more circumspectly, and weighed somewhat differently, where no liberty interest looms.

■ 1. *Diligence.* We begin with the officers' diligence—or lack of it. The district court counted this element against the government, finding that "[t]he officers chose a mode of investigation that was convenient for them, with apparently no consideration for minimizing or avoiding the intrusion...." *LaFrance,* 702 F.Supp. at 354. But, having focused on how it thought the choice was made, the court never analyzed the reasonableness of the chosen course of action. We must rectify this omission.

Having scoured the record, it seems plain that there was no lack of diligence. Two of the key officers, Avery and Gallagher, were on leave when the package surfaced. Avery was the case officer, Gallagher the nearest dog-handler; no one challenges the propriety of doing a sniff test or having them present for it. That said, we note that both men, though off duty, readily agreed to help (not the actions of those who put their own convenience first). Given that Avery was responsible for his infant son and thus engaged until 11:28 a.m. in any case, we think it undeniably reasonable to have scheduled the sniff test at some time shortly thereafter, especially since, as already noted, the officers' timetable had a *de minimis* impact on appellees' possessory interests before noon and could hardly have been tailored to lessen that impact. The police, as well as appellees, should be allowed to bank on FedEx's noon delivery commitment, at least under these circumstances.[5]

■ Nor were the lawmen heedless of the need for some minimization. The decision to probe for probable cause by using the sniff test itself suggests an attempt to reduce any intrusion. *See Place,* 462 U.S. at 707, 103 S.Ct. at 2644 ("no other investigative procedure ... is so limited both in the manner in which the information is obtained and in the content of the information revealed" as the canine sniff). As we read it, the record shows a determined police endeavor to minify both the length of detention and the investigation's intrusiveness. We fully agree that, in hindsight, the police may not have acted in the most expeditious manner; but government agents are neither seers nor paragons, held to a standard of predicting each twist and turn of future events and achieving near-perfect results. Diligence, we think, is fairly characterized by steady, earnest, energetic, and attentive application and effort toward a predetermined end. That test was satisfied in this case; the officers acted with reasonable diligence under the circumstances. *Cf. West,* 731 F.2d at 92 (especially if canine sniff test is to be used, "the government must have some flexibility").

2. *Timeliness.* Turning next to timeliness, it is accurate, as the district court wrote, that the government's choices were *"certain* to produce a delay in delivery...." *LaFrance,* 702 F.Supp. at 354 (emphasis in original). Given that no one challenges Avery's presence, the sniff test could not have begun until some time after 11:28 a.m.[6] The test itself lasted approxi-

---

5. Agent MacMaster testified he had been told that the FedEx trucks "usually get in [to Lewiston] around noon anyway" and so scheduled the "review right after that." R.A. 14–15.

6. Avery was unavoidably occupied with the care of his infant son until then, and obviously required some travel time thereafter to reach the stationhouse.

mately one hour. Accordingly, the amount of time over which a dispute about reasonableness exists is, in fact, about one hour and forty-five minutes at most. Even if all of that time may be held against the government, the length of detention does not seem inherently unreasonable.

Time *qua* time is of concern in the luggage seizure cases because of the concomitant impingence on liberty. While a traveler remains "technically ... free to continue ... his travels or carry out other personal activities pending release of the luggage[,] ... he is [nevertheless] subjected to the possible disruption of his travel plans in order to remain with his luggage or to arrange for its return." *Place*, 462 U.S. at 708, 103 S.Ct. at 2645 (footnote omitted). In contradistinction, where liberty was not implicated at all, the Court has been willing to acknowledge only a "[t]heoretical[ ]" per se time limit on detention of packages taken from the mails. *Van Leeuwen*, 397 U.S. at 252, 90 S.Ct. at 1032. Whereas FedEx's noon delivery schedule requires that we apply a somewhat stricter time constraint in this case—*Van Leeuwen*, after all, can be distinguished; death and taxes, arguably, may be certain, but the United States mails are not—we must nevertheless balance length of detention not against an amalgam of possessory and liberty interests, but only against dispossession of the contract-based interest in timely delivery. And we note that such a contractual interest has not yet proved to be a decisive counterweight to the public's interest. *See Jacobsen*, 466 U.S. at 112, 104 S.Ct. at 1655 (package dealt with in "due course"; "delivery" not mentioned) (dictum); *United States v. Hillison*, 733 F.2d 692, 694–95 (9th Cir.1984) (upholding seven hour detention of "priority mail" package). So weighed, neither the detention's duration nor its intrusiveness seem disproportionate in this instance.

3. *Information.* The third of the *Place* factors necessitates consideration of the information given appellees. Where, as here, detention occurs after the owner has relinquished control of an inanimate object to a third party, we doubt that this factor has much (if any) relevance. In *Van Leeuwen*, for example, the Court never mentioned an obligation to impart information; and in *Jacobsen*, which also involved internment of a FedEx package, the Court did not allude to any such obligation even when discussing the "manner of execution" of the seizure. *See Jacobsen*, 466 U.S. at 124, 104 S.Ct. at 1662.[7] The same is true of "third-party" decisions in the courts of appeals. *See, e.g., Dass*, 849 F.2d 414 (seizure from mails); *Hillison*, 733 F.2d 692 (same). Moreover, the underlying rationale of *Place* itself suggests that the information factor is likely irrelevant to seizures from third parties. If accurate, information about where luggage has been taken, for how long, and how it may be returned, is important largely because it affects a liberty interest (the possessor's ability to travel); misinformation can obviously cause delay, disruption of routing and timing, or general inconvenience. *See Place*, 462 U.S. at 708, 103 S.Ct. at 2645; *West*, 731 F.2d at 94. Where the intrusion implicates only a possessory interest, however, that interest is usually unaffected by the place at which the seized article is kept and what one is told, so long as the object's condition is undisturbed. Only information about how long the detention may last is relevant, because only such information relates to the length of dispossession.

We need not decide, once and for all, whether information imparted is a factor worthy of substantial consideration in a third-party seizure which implicates only possessory, not liberty, interests. In this case, the government asked FedEx to watch for the package, and then to hold it—nothing more. Contrary to the district court's suggestion, *LaFrance*, 702 F.Supp. at 354, there is no rule of law which placed the police under an obligation, at least in these early hours, to telephone the parcel's intended recipient and tell him the nature and cause of the delay. *Cf. United States v. Bouthot*, 878 F.2d 1506, 1512 (1st Cir.

***

7. We think the omission in *Jacobsen* especially significant in that *Jacobsen* postdated *Place*. So, too, the Ninth Circuit's decision in *Dass*, 849 F.2d 414.

1989) (discussing, in different context, why government's knowing silence not equivalent to active misrepresentation). The record does not support an inference that the officers instructed FedEx's staff to be vague, evasive, false, or misleading.[8] We are thus chary about debiting the government's account in consequence of a private party's deceptive statements when those statements well exceed the bounds of the agents' stated request.

### E

We recapitulate and pull together the strands of our analysis. Appellees' contract-based interest in delivery of the package was, to all intents and purposes, substantially unscathed before noon. From noon until 2:15 p.m., appellees' interests in timely delivery and possession were impaired. No liberty interest being at stake, only those possessory interests may be weighed against the detention. The measure of the ensuing balance is one of reasonableness. In a package detention case such as this, the law does not require the police to use the least intrusive means imaginable. It is the reasonableness of the path chosen and of the march, not the putative celerity of hypothetical alternatives, that is the issue.

When this model is constructed from the evidentiary erector set at hand, it clearly appears that the detention was within the ambit of reasonableness. The officers did not act with either military precision or ultimate dispatch—but they were not required to do so. Their choices, while not perfect, were acceptable. Their conduct reflected due diligence and a concern for lessening any actual intrusion. Where policemen had to be assembled from different locales (some summoned from days off), and where the desired test itself consumed some appreciable time, we do not believe that a 135 minute detention approached the margins of the theoretical limit of reasonableness envisioned in *Van Leeuwen.*

### III

We need go no further. No right protected by the fourth amendment was invaded by the officers' interference with delivery of the parcel, nor was there any impermissible intrusion on appellees' possessory interests. The detention, given its relatively brief duration, the limited nature of the interests at stake, the diligence of the police, and other relevant considerations, was reasonable. Because the evidence ought not to have been suppressed, the order of the district court must be, and hereby is,

*Reversed.*

---

8. Certainly, the district court's conclusion that the police "gave instructions to dissemble," *LaFrance,* 702 F.Supp. at 354, is pure conjecture, devoid of record support, and therefore not binding. Moreover, even if it could be inferred that some tacit understanding existed, there is no evidence as to who among the company employees knew what was happening. LaFrance could not identify the person or persons with whom he spoke. Whether or not potentially legitimate, a court cannot grant the inference absent proof that some employee with knowledge of the detention communicated false information under the aegis of the police.