THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v. CRAIG L. SHAPIRO *et al.*, Defendants-Appellees.

Fourth District   No. 4—95—0584

Opinion filed August 23, 1996.

STEIGMANN, J., specially concurring.

John C. Piland, State's Attorney, of Urbana (Norbert J. Goetten, Robert

J. Biderman, and Elliott Turpin, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Thomas A. Bruno, of Urbana, for appellees.

JUSTICE GARMAN delivered the opinion of the court:

Pursuant to Supreme Court Rule 604(a)(1) (145 Ill. 2d R. 604(a)(1)), the State appeals an order of the circuit court of Champaign County granting motions to suppress evidence and quash arrest filed by defendants, Craig Shapiro and Rachel Smith. We affirm.

Defendants were charged with possession, with intent to deliver, 200 grams or more of a substance containing psilocybin (a controlled substance). 720 ILCS 570/401(a)(11) (West 1994). The arrests were based upon a search warrant executed at Smith's apartment, where officers seized controlled substances, drug paraphernalia, and cash. A package containing mushrooms laced with psilocybin was among the items seized. This package had been sent through the United States Postal Service (Postal Service) express mail and was the subject of a controlled delivery by law enforcement and postal inspection authorities. After Shapiro accepted delivery of the package, police executed the search warrant.

## I. PROCEEDINGS IN THE TRIAL COURT

At the suppression hearing, United States Postal Inspector Stephen Atterbury, based in St. Louis, Missouri, testified that on Thursday, January 19, 1995, he received a telephone call from personnel in the Chicago branch of the Postal Service stating that an express mail package had been removed from the mail stream at O'Hare International Airport (O'Hare). The package was then placed in two additional express-mail containers and sent to him. He received it the next day. The reason the package was sent to him rather than examined in Chicago was that the address of the package placed it in his jurisdiction. He examined it to see if it fit into the Postal Service "drug package profile." The package measured approximately 14 by 14 by 9 inches and was wrapped in heavy brown paper, with the seams heavily taped. The package was mailed from Eugene, Oregon, to an address in Champaign, Illinois. The "drug package profile" consists of various criteria developed by the Postal Service which may indicate the presence of contraband. Those criteria are (1) heavy brown paper wrapping, (2) heavily taped seams, (3) handwritten address label, (4) sent from one individual to another, (5) mailed from a zip code different than the return address, and (6) a fictitious return address. Atterbury noted that all these characteristics applied to the package he received from Chicago. However, crite-

rion No. 6 was not determined in Chicago; he personally called Eugene, Oregon, and found that the return address did not exist. Atterbury then contacted the St. Louis County police department canine unit and a detective brought a narcotic-trained dog to check the package. The package was placed in a room, and the dog's response to it indicated the presence of a narcotic odor. Atterbury completed an affidavit for a search warrant and presented it to a federal magistrate who issued a search warrant at 2:38 p.m. on Friday, January 20, 1995. Atterbury testified he did not know what specific narcotics the dog had been trained to detect, but admitted his affidavit stated the dog was trained to detect a number of controlled substances, none of which was psilocybin. Atterbury then opened the package and found it contained a box wrapped in wrapping paper. He opened that package and found a box containing two packages. Inside the packages were mushrooms. The contents of one package field-tested positive for psilocybin. Atterbury then "seized" the package and contacted Task Force Ten in Champaign County to arrange for a controlled delivery. The arrangements were completed in the late afternoon on Friday, January 20, 1995, for a delivery on Monday, January 23, 1995. Atterbury traveled to Champaign and personally delivered the package to Smith's apartment. When Shapiro answered the door, Atterbury told him the package was addressed to Smith, and Shapiro indicated she was not there. Shapiro said he also lived in the apartment, and Atterbury told him he could sign for the package.

Champaign police officer Jeff Munds testified that he was contacted by Atterbury to assist in arranging the controlled delivery. He also received a copy of Atterbury's affidavit and the search warrant issued by the federal magistrate. With this information, a complaint for search warrant was prepared and submitted by Munds to Judge Parkinson. The warrant was issued at 2:40 p.m. on Monday, January 23, 1995. Munds indicated he had discussed execution of the warrant with Judge Parkinson. The assistant State's Attorney asked Munds what direction Judge Parkinson had given him. Munds answered, "Judge Parkinson made it clear that the warrant would only be valid—." At this point, defense counsel interrupted with an objection based on hearsay. After discussion with the attorneys as to whether the condition for execution of the warrant must be shown on the face of the warrant, or whether the judge may recite it verbally, the trial court sustained the objection. The State did not submit an offer of proof as to Munds' conversation with Judge Parkinson. The package was delivered at approximately 8:30 a.m. on January 24, 1995. After delivery, Champaign police officers executed

the search warrant and found the express mail package, as well as other contraband and cash.

Munds testified he had no prior contact with Shapiro or Smith and he had received no information concerning either of them which would raise suspicion about their activities.

After hearing arguments of counsel, the trial court granted the motions, finding there was probable cause for the issuance of the search warrant by Judge Parkinson, based upon reliability of the information upon which it was based and anticipated delivery of the package. However, the court found that the failure to include on the face of the warrant conditions precedent to the execution of the warrant rendered it invalid. The court found Judge Parkinson's verbal instructions to Officer Munds concerning conditions upon which the warrant was to be executed insufficient. In addition, the court found that even if verbal instructions could supply the conditions, they were insufficient because the package was to be delivered on January 23, 1995, as indicated in the complaint for the search warrant, yet it was not delivered until the next day. The court also found the good-faith exception of *United States v. Leon*, 468 U.S. 897, 82 L. Ed. 2d 677, 104 S. Ct. 3405 (1984), was not applicable because the warrant lacked the conditions of execution and was therefore not facially valid. The court also found, however, that assuming the *Leon* exception applied, it must determine whether the search warrant issued by the federal magistrate in St. Louis was valid. The court stated this warrant was supported by probable cause, based upon the characteristics of the package and the fact the narcotics dog reacted positively to the package for the presence of narcotics odor. However, the court indicated that validity of this warrant depended upon whether the information relied upon by Atterbury in his affidavit for the warrant was obtained legally. The court concluded that removal of the package from the mail stream in Chicago was not supported by probable cause, thereby rendering the St. Louis search warrant invalid. The court found that the removal was a seizure. The package was taken from the mail stream, repackaged in two additional containers, and sent out of state for further inspection. The court noted there was no evidence that Eugene, Oregon, was a "target city," *i.e.*, a location from which drugs are known to be sent. The court found that the fact the package met several of the other criteria in the drug package profile did not constitute probable cause, noting there must be many packages similar to this one that are perfectly legal. The court remarked that surely the federal authorities could have undertaken in Chicago what was done in St. Louis. The State filed a certificate of impairment, and this appeal ensued.

## II. ANALYSIS

We first note that a trial court's ruling on a motion to suppress will not be disturbed on review unless the decision is against the manifest weight of the evidence. *People v. Binder*, 180 Ill. App. 3d 624, 627, 536 N.E.2d 218, 220 (1989). Where neither the facts nor credibility of the witnesses is questioned, the appellate court may review the issue *de novo. People v. Graves*, 196 Ill. App. 3d 273, 276, 553 N.E.2d 810, 812 (1990).

The State first argues that the trial court applied the wrong standard to the initial seizure of the package in Chicago. It maintains that applying the correct standard of "reasonable suspicion" demonstrates that the seizure was proper. In support of this argument, it cites *United States v. Van Leeuwen*, 397 U.S. 249, 25 L. Ed. 2d 282, 90 S. Ct. 1029 (1970), in which respondent mailed two packages at a town near the Canadian border. One package was addressed to a post office box in Van Nuys, California, and the other was addressed to a post office box in Nashville, Tennessee. The packages, each weighing approximately 12 pounds, were to be sent airmail registered and were insured for $10,000 each. Respondent told the postal clerk the packages contained coins. The clerk expressed suspicion about the packages to a police officer who happened to be nearby. The officer noticed the automobile license plates on respondent's car were from British Columbia and that the return addresses on the packages were from a vacant housing area of a nearby junior college. The police officer called Canadian police, who in turn called customs in Seattle $1^{1}/_{2}$ hours after respondent had mailed the packages. Customs officials determined the addressee of the package destined for Van Nuys was under investigation for trafficking in illegal coins. Because of the time differential, customs was unable to contact Nashville until the next morning. It was also determined there that the addressee of the Nashville package was under investigation for the same illegal conduct. After a search warrant was obtained by customs officials, the packages were opened, inspected, resealed, and sent on their way. Respondent was convicted of illegally importing gold coins.

The question on appeal to the Supreme Court was whether the detention of the packages contravened the fourth amendment because no warrant was obtained. The court noted that, theoretically, detention of mail could at some point become an unreasonable seizure within the meaning of the fourth amendment. However, the court held that, based upon the facts of the case, detention of the packages was not unreasonable and no warrant was needed. In so holding, the court emphasized (1) the nature and weight of the pack-

ages, (2) the fictitious return address, (3) the fact that respondent had British Columbia license plates on his car, and (4) that respondent mailed the packages in a border town. These factors justified detention without a warrant while an investigation was made. This was particularly true in light of the fact that there was only a $1^1/2$-hour detention while an investigation was made. At the end of that time, there was probable cause to believe the package destined for Van Nuys was part of an illegal project. The same determination was made as to the Nashville package as soon as possible, and a warrant was issued for both packages only $26^1/2$ hours after mailing. The search warrant was executed three hours later. Thus, detention was not unreasonable. *Van Leeuwen*, 397 U.S. at 253, 25 L. Ed. 2d at 286, 90 S. Ct. at 1032-33.

In *United States v. Place*, 462 U.S. 696, 77 L. Ed. 2d 110, 103 S. Ct. 2637 (1983), police were at Miami International Airport as respondent was standing in line to purchase a ticket to New York's La Guardia Airport (La Guardia). His behavior aroused suspicions of police officers who approached respondent and asked to see his ticket and some identification. Respondent complied and consented to a search of his two suitcases. However, since the plane was about to depart, the officers did not search the luggage. When respondent commented upon leaving that he had recognized the officers as police, the officers inspected the address tags on respondent's luggage and noted discrepancies in the two street addresses. Upon further investigation, it was discovered the addresses did not exist and that the telephone number given by respondent to the airline belonged to a third address on the same street. The officers notified law enforcement authorities in New York and, as respondent deplaned at La Guardia, he was met by agents who noticed suspicious behavior from respondent. Respondent told them the officers in Miami had searched his luggage, which the New York officers knew was untrue. Respondent refused to consent to a search of his luggage, and the officers told him they were taking the luggage to a federal judge in an attempt to obtain a search warrant. Respondent then left, and officers took the luggage to Kennedy Airport, where it was subjected to a canine sniff 90 minutes after seizure of the luggage. The dog reacted positively to one of the bags and ambiguously to the other. Because it was late on a Friday afternoon, the officers decided to hold the luggage until Monday, when they obtained a search warrant. The bag to which the canine had reacted positively contained cocaine. Respondent's motion to suppress evidence was denied, but this decision was reversed by the court of appeals.

The Supreme Court applied the principles of *Terry v. Ohio*, 392

U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968), in holding that personal luggage may be seized from the owner on the basis of reasonable suspicion, for the limited purpose of pursuing a limited course of investigation, short of opening the luggage. The court further held that subjecting luggage to a canine sniff was not a search within the meaning of the fourth amendment. As to seizure of the luggage, the court held that the length of time the luggage was held prior to being subjected to the canine sniff (90 minutes) was unreasonable in the absence of probable cause. The unreasonableness of the seizure was exacerbated by the fact that police failed to inform respondent where they were taking his luggage, how long it would be held, and how it would be returned to him. *Place*, 462 U.S. at 709-10, 77 L. Ed. 2d at 122-23, 103 S. Ct. at 2645-46.

■ Courts have consistently applied the principles set forth in *Van Leeuwen* and *Place* to investigatory detention of packages and letters sent through the mail and via private courier services. Thus, we agree that *Terry* principles apply here, and the proper standard to be applied to the seizure of the package in Chicago was whether authorities had a reasonable suspicion, based upon articulable facts, that the package might contain illicit narcotics. This is particularly true in light of the fact that a limited detention of the package would invade no privacy, possessory, or liberty interests of either defendant. See *People v. McPhee*, 256 Ill. App. 3d 102, 112, 628 N.E.2d 523, 531 (1993); *United States v. LaFrance*, 879 F.2d 1, 4 (1st Cir. 1989).

This brings us to the question of whether the characteristics of the package relied upon by the Postal Service in removing the package from the mail stream were sufficient to support the concept of reasonable suspicion. Shapiro argues, and the trial court found, that the characteristics of the package noted by Chicago Postal Service authorities were largely benign characteristics which might apply to many packages sent by express mail. However, postal authorities need not be *certain* that a particular package contains narcotics. Indeed, certainty would be impossible to attain, even with the assistance of a drug detection canine. The standard is only that of reasonable suspicion. The Postal Service has identified certain characteristics found to be present in many packages containing illicit narcotics. In addition to those testified to by postal inspector Atterbury, another factor identified in the cases is that the package originates from a "target" city, *i.e.*, one known to be a source of illegal drugs. However, there is no precedent in Illinois applying these factors.

Shapiro cites the *McPhee* case in support of his argument that the drug package profile did not provide reasonable suspicion to detain the package. In *McPhee*, a police detective at Los Angeles

International Airport was at the Federal Express facility with his drug detection dog. He was going through the packages there when he noticed an envelope addressed to the defendant. The detective testified that he was looking for packages which were (1) not delivered by truck or courier, (2) paid for in cash with handwritten "airbills," and (3) going from one individual to another. Defendant's envelope met these three criteria, but, other than this, there was nothing suspicious about the envelope. The officer took the envelope and locked it in his squad car. Approximately 20 minutes later, the officer took the envelope out of the car and subjected it to a canine sniff, which indicated the presence of illicit narcotics. On appeal, the court held that detention of the envelope was unreasonable because the mere existence of the three stated characteristics, without more, was insufficient to support a reasonable, articulable suspicion that the envelope contained contraband. *McPhee*, 256 Ill. App. 3d at 113, 628 N.E.2d at 531. We note the opinion in *McPhee* does not discuss a drug package profile, nor does it appear there was testimony at the suppression hearing concerning any such profile. The reasons for the officer's determination as to which packages might contain contraband are not revealed in the opinion. Thus, Shapiro's argument that the *McPhee* case rejected the validity of the drug package profile as providing reasonable grounds for detention is not convincing. As that question was not squarely discussed, the case provides no assistance to either defendants or the State.

Our independent research has located no Illinois case in which the concept of the drug package profile is discussed, although the subject has been dealt with by some of the federal courts. In *United States v. Lux*, 905 F.2d 1379 (10th Cir. 1990), defendant was convicted of drug offenses. Postal authorities had identified a package being sent by express mail as fitting the characteristics of the Postal Service "drug package profile." The package was removed from the mail stream and subjected to a canine sniff. The dog alerted to the package. It was eventually delivered to defendant after a search warrant was obtained, and cocaine was found inside. Defendant argued on appeal that the district court had erred in denying her motion to suppress, contending the initial detention of the package was illegal under the fourth amendment. In rejecting this contention, the court of appeals noted the package met three of the characteristics of the Postal Service drug package profile and that this gave authorities sufficient reason to remove it from the mail stream and subject it to the drug detection dog. However, the opinion does not identify which characteristics the package possessed, nor was there any further discussion of the issue. *Lux*, 905 F.2d at 1382.

Another case, *United States v. Daniel*, 982 F.2d 146 (5th Cir. 1993), also discussed the drug package profile, but that case also involved additional factors which weighed in favor of detention of the package. There, an employee of an airline notified narcotics agents of what the employee believed was a suspicious package being shipped by the airline. The package was the second one sent by the sender to the same address in a single week. The private courier's shipping fee of $55 was substantial compared to the cost of sending such a small package through the mail. Upon inspecting the package, the agent noted the addresses were handwritten and the return address did not contain a zip code. All the seams of the packaging were securely sealed with masking tape. The receipt completed by the sender indicated the box contained "parts." When the agent shook the box, nothing rattled, thus arousing his suspicions that the box possibly contained illicit narcotics. A drug detection dog was summoned and reacted positively to the box. A search warrant was obtained, and the box was opened, revealing bags of methamphetamine. After a controlled delivery, defendant was arrested. On appeal, the court upheld the investigatory detention of the package, stating that while any one of the drug package profile criteria, standing alone, might not provide reasonable suspicion, an aggregate of factors meets the requirements of the *Terry* doctrine. The court noted that while it was Federal Express, not the Postal Service, handling the package in the case before it, the agent who seized the package appeared to utilize the same drug package profile in articulating his suspicions justifying detention of the package. The court noted the following factors supporting the agent's decision: (1) the size and shape of the package, given the declared contents, (2) all seams securely taped, (3) handwritten labels, even though the package was addressed to a business, (4) the airline employee's statement that this was the second such mailing in a week, (5) the sender paid a large fee, and (6) the sender's city was a common drug source. The court concluded that "under widely accepted law enforcement standards regarding the detection of drug-related mailings," the agent's suspicions were reasonable. *Daniel*, 982 F.2d at 150.

■ In the instant case, the express mail package met four of the drug package profile characteristics of the Postal Service. There were no additional factors to indicate the package was suspicious. There were also two important characteristics of the profile which were conspicuously absent from this package when it was detained in Chicago, *i.e.*, (1) authorities did not know that the return address was fictitious, and (2) there was no evidence that Eugene, Oregon, is a known source of illicit narcotics. We would be more comfortable find-

352

ing the existence of reasonable suspicion had the additional factor of the fictitious return address been determined in Chicago, rather than sometime later in St. Louis. However, since we have found no countervailing authority, and in light of the *Lux* case, we conclude that the characteristics exhibited by the package did provide reasonable suspicion to remove it from the mail stream for the limited purpose of further investigation.

■ The next issue which must be addressed is whether detention of the package was unreasonable and, thus, a violation of the fourth amendment. The underlying inquiry is whether the detention, taken as a whole or any step therein, was unreasonable. Three factors relevant to this inquiry are (1) investigatory diligence, (2) length of detention, and (3) information conveyed to the suspect. See *Place*, 462 U.S. at 709-10, 77 L. Ed. 2d at 122-23, 103 S. Ct. at 2645-46; *United States v. Allen*, 990 F.2d 667, 671 (1st Cir. 1993). These factors have been applied by the federal courts in contexts similar to the instant case. In *LaFrance*, police received anonymous tips about drug trafficking by defendant and that he often stored drugs at his father's house in Lewiston, Maine. It was learned that defendant had, for some months, sent and received Federal Express packages weekly. Prior to 9 a.m. on a day in June 1986, Federal Express officials, as they had been requested to do, notified police when a package addressed to defendant's father arrived at its Portland, Maine, facility. Evidence indicated that Federal Express guaranteed overnight delivery of packages by noon the following day. Thus, the package was to be delivered on the very day police were contacted. Police instructed Federal Express to deliver the package to the police station in Lewiston. In the meantime, officers attempted to arrange for a drug detection dog to come to the station. The sniff test was completed at approximately 2:15 p.m., and a search warrant obtained. The package was finally received by defendant at approximately 5 p.m., after he had made several inquiries to Federal Express concerning its whereabouts. In response to his inquiries, Federal Express personnel made misleading statements. In determining that the delay in confirming the officers' suspicions about the package was not unreasonable, the appeals court noted that no possessory interest of defendant was invaded prior to the appointed hour for delivery of the package. Once noon arrived, however, defendant had a contract-based right to possess the package. Thus, defendant was dispossessed for some 135 minutes (from noon to 2:15 p.m.). The court found the officers acted diligently, noting two of the officers involved were off duty at the time the call came from Federal Express. The nearest dog handler did not live in Lewiston and had to travel from his resi-

dence. The court stated that diligence is "fairly characterized by steady, earnest, energetic, and attentive application and effort toward a predetermined end." *LaFrance*, 879 F.2d at 8. It also found the timeliness factor in favor of the police, stating that a dispossession of less than two hours was not unreasonable. As to the third factor, the court noted there was no evidence that defendant had been misled by Federal Express personnel at police request or direction. *LaFrance*, 879 F.2d at 8-10.

In *Allen*, the defendant was convicted of drug offenses. A Postal Service inspector had become suspicious of two express mail package receipts addressed to a Kurt Humphrey in Maine from two different locations on the west coast. The name of the sender was identical to that of a sender who had been under investigation. In addition, both return addresses were false. The postmaster at the destination was instructed to watch for future express mail packages addressed to Humphrey from the west coast. Such a package from Oregon arrived one day at 7 a.m. The postmaster contacted the postal inspector, who instructed the postmaster to hold the package. The package had a guaranteed delivery time of 3 p.m. When it was 7 a.m. on the west coast, the postal inspector called Oregon and determined the sender's name and address were fictitious. Arrangements were then made in Maine to have a trained drug detection dog sniff the package for drugs. This was done some four to five hours after the postal inspector had been contacted. After the dog alerted to the package, a search warrant was obtained and the package found to contain "LSD." *Allen*, 990 F.2d at 669. Police replaced the package with a dummy package, which was picked up by Humphrey the next day. Police followed him and arrested him on his way to defendant's house. The trial court denied defendant's motion to suppress evidence and the court of appeals agreed with this decision, noting that authorities reasonably suspected that the package contained narcotics and did not unreasonably delay delivery of the package. They acted diligently, and any delay in delivery lasted only as long as necessary. In addition, the court noted that defendant received no misinformation about the package; indeed, he had not even inquired about it. *Allen*, 990 F.2d at 671-72.

In *United States v. Banks*, 3 F.3d 399 (11th Cir. 1993), an informant notified police that defendant had sent narcotics through the mail in the past and gave the officer a receipt for an express mail package addressed to another person. He told the officer that the package was at the post office and delivery had been attempted that day. A drug detection dog's sniff of the package indicated the presence of narcotics. A search warrant was obtained and the package

opened, revealing the presence of cocaine. A second notice was given to the addressee that the package could be picked up the next day. Defendant was arrested as he left the post office with the package. The trial court denied his motion to suppress evidence. The court of appeals affirmed, noting that the detention, investigation, and renotification all occurred on the same day. *Banks*, 3 F.3d at 402.

■ Applying the rationale of the federal cases to the instant case leads us to conclude that detention of the package was in fact unreasonable. The State argues that postal authorities and law enforcement authorities acted diligently, noting that once each hurdle in the process was cleared, the next was confronted and cleared without delay. However, this argument assumes that the process itself was reasonable. The package was detained in Chicago, where it passed through O'Hare on the way to its ultimate destination in Champaign. Had the investigation proceeded there, a different situation may have been presented. However, the investigation took place several hundred miles away in St. Louis. The only reason given by Inspector Atterbury for this unusual procedure was that postal service regulations gave St. Louis authorities jurisdiction to further inspect the package. However, the requirements of the fourth amendment may not be forced to yield to regulations of government agencies. Rather, the opposite should be true.

Because of the time required to send the package to St. Louis and the distance between Champaign and St. Louis, this package was held by officials from Thursday to the next Tuesday before delivery was attempted. Even discounting the intervening Sunday, postal authorities held the package for three full days and part of a fourth day before it was delivered early in the morning of the fifth day. Since this was an express mail package, we may rightly assume that the guaranteed delivery time passed days prior to its eventual delivery. No case has been cited to us, nor are we independently aware of any case, which has approved such a lengthy delay. Thus, even though those responsible for carrying out the investigation may have personally acted with diligence, the process of investigation which was utilized invariably led to an unreasonable length of detention prior to delivery. The third factor, information conveyed to the suspect, has no application here, as there was no evidence any information was conveyed to either defendant. While we are sensitive to the need of law enforcement for some flexibility in situations such as this, the only need we are aware of here is the need of the Postal Service to adhere to its regulations. While such regulations undoubtedly serve a legitimate purpose in other contexts, the interests of individuals in the preservation of their fourth amendment rights must take

precedence here. We conclude, therefore, that the detention of the package was unreasonable and, for this reason, the circuit court's judgment must be affirmed.

In light of our holding, we need not address the other issues raised by the State.

Affirmed.

COOK, J., concurs.

JUSTICE STEIGMANN, specially concurring:

"The poorest man may, in his cottage, bid defiance to all the force of the Crown. It may be frail; its roof may shake; the wind may blow through it; the storm may enter; the rain may enter; but the King of England may not enter; all his force dares not cross the threshold of the ruined tenement." William Pitt addressing Parliament, as quoted in N. Lasson, The History and Development of the Fourth Amendment to the United States Constitution 49-50 (1937).

Sometimes it is important for courts to return to first principles when analyzing issues coming before them. This is such a case.

The eloquence of William Pitt, as quoted above, constitutes part of the context of experience in England and her American colonies that served to shape the fourth amendment to the United States Constitution, which the Congress of the United States drafted in 1789. Pitt's remarks, as well as the simple eloquence of the fourth amendment itself—"[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized" (U.S. Const., amend. IV)—demonstrate what that amendment was designed to achieve: a restraint upon governmental interference with the property of its citizens. That amendment instructs the government that—in the absence of the limited exceptions contained within the amendment—it must leave the property of its citizens alone. By doing so, the amendment empowers the citizens of this nation to go about their daily business without the fear that exists almost everywhere else in the world of arbitrary governmental search or seizure of their property.

Given these fundamental principles, I find the present case vexing not because of anything the majority says, but because of the analysis that is missing. That analysis would address the fundamental

question of why, under the facts of this case, detention by the postal authorities implicates the fourth amendment at all.

Perhaps the best way to explain why this case bothers me is to emphasize what it does *not* concern: (1) a governmental seizure of some citizen's property from his person, home, automobile, office, or anywhere else; or (2) the government's opening of some citizen's sealed container and inspecting its contents. Instead, this case concerns a citizen's rights when *he brings a package to a government agency*—the Postal Service—*and asks that agency to transport it* to a particular destination. Having paid the appropriate fees for this service, the citizen had every right to expect that his package would be transported accordingly and without undue delay in delivery. Of course, in this case, delay in delivery did occur because law enforcement authorities decided to detain the package for further investigation (although it must be emphasized that this detention did not include opening the package). Clearly, this detention breached the contract the Postal Service had with the citizen who mailed the package and might even have constituted a breach of some statutory duty Congress has imposed upon the Postal Service regarding its handling of mailed packages. However, for purposes of this case, neither of these breaches is relevant. The question this court must ask is when—and how—does detention of a package a citizen voluntarily delivers to the United States Postal Service constitute a seizure in violation of the fourth amendment to the United States Constitution?

In the thousands of cases involving search and seizure law under the fourth amendment, there appears no other factual context (other than the one where a citizen mails a package through the Postal Service) in which that amendment is implicated when a citizen *voluntarily* delivers a package to the government for its handling. In every other case I am aware of, the government has taken some affirmative action to interfere with a citizen's right or interest in his property by either seizing it or searching it.

In this case, the government did not seize the package in issue; the citizen voluntarily turned it over to government agents when he mailed it. If he did not want the government to be involved in any way with his package, he could have chosen to use some private carrier instead of the Postal Service. Having elected to give his package to the government, however, how can he now complain that the government has somehow "seized" it?

Further, what occurred in this case does not constitute a search because the package in question was never opened; it was merely held for further noninvasive scrutiny by drug-sniffing dogs. The law is clear that such scrutiny does not, by itself, constitute a search, and

defendant does not argue that it does. Thus, again, the question arises: how does the mere detention of a package voluntarily delivered to the government (although perhaps the detention violates a contract or statute) come to violate the fourth amendment's prohibition against unreasonable searches and seizures?

I do not fault my colleagues in the majority for their analysis because this court must follow decisions of the United States Supreme Court when that Court interprets the United States Constitution. Accordingly, the problem lies with the decision of that Court in *Van Leeuwen*, where the Court observed that, "[t]heoretically—and it is theory only that respondent has on his side—detention of mail could at some point become an unreasonable seizure of 'papers' or 'effects' within the meaning of the Fourth Amendment." *Van Leeuwen*, 397 U.S. at 252, 25 L. Ed. 2d at 285, 90 S. Ct. at 1032. Regrettably, the Court never explained this statement, either in *Van Leeuwen* or in any subsequent case, and I am unable to discover *any* decision by any court of review (or even noted commentators, such as Professor Wayne LaFave) that does so.

The cases the Court cited in *Van Leeuwen* to support its holding could hardly have less to do with the issue of postal authorities detaining mail for noninvasive inspection. Those cases are *United States ex rel. Milwaukee Social Democratic Publishing Co. v. Burleson*, 255 U.S. 407, 437, 65 L. Ed. 704, 720, 41 S. Ct. 352, 363 (1921) (Holmes, J., dissenting), *Hannegan v. Esquire, Inc.*, 327 U.S. 146, 90 L. Ed. 586, 66 S. Ct. 456 (1946), and *Lamont v. Postmaster General*, 381 U.S. 301, 306-07, 14 L. Ed. 2d 398, 402, 85 S. Ct. 1493, 1496 (1965). In *Lamont*, the Court held unconstitutional a statute requiring the Postal Service to detain and destroy unsealed mail from foreign countries determined to be communist political propaganda unless the addressee returned a reply card indicating his desire to receive such mail. The Court premised its holding upon the first amendment, and the case had nothing to do with the fourth amendment. *Lamont*, 381 U.S. at 307, 14 L. Ed. 2d at 402, 85 S. Ct. at 1496-97.

*Burleson* involved the revocation, pursuant to the Espionage Act of 1917 (ch. 30, 40 Stat. 217, 230 (1917)), of a second-class mail rate granted in 1911 to the publisher of the *Milwaukee Leader*. The Postmaster General claimed that the publication frequently contained articles containing "false reports and false statements, published with intent to interfere with the success of the military operations of our Government[.]" *Burleson*, 255 U.S. at 412, 65 L. Ed. at 709, 41 S. Ct. at 354. The Supreme Court affirmed. In *Hannegan*, the Postmaster General revoked *Esquire* magazine's second-class mail permit because he found the magazine not to be published "'for

the public good' " or as a " ' "special contribution to the public welfare." ' " *Hannegan*, 327 U.S. at 149-50, 90 L. Ed. at 588-89, 66 S. Ct. at 458. The Supreme Court reversed, holding that "a requirement that literature or art conform to some norm prescribed by an official smacks of an ideology foreign to our system." *Hannegan*, 327 U.S. at 158, 90 L. Ed. at 593, 66 S. Ct. at 462.

I dislike unwarranted interference by postal authorities with mailed packages as much as the next person, and the Congress of the United States might see fit to provide a *statutory* exclusionary rule when such detentions occur. However, I have difficulty finding a principled basis upon which to conclude that the actions of the postal authorities in this case constituted a seizure in violation of the fourth amendment. Nonetheless, I concur because the Supreme Court decision in *Van Leeuwen*—bereft of analysis though it may be—constitutes a sufficient basis for the majority opinion. I write separately in the hope that one day some court beyond this mere state intermediate appellate court might actually confront this issue and provide the analysis that a principled jurisprudence ought to require before the suppression of evidence occurs.