**Espinoza v. SSA**                    **CV-98-065-B    04/30/99**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE


Robert Espinoza

    v.                                    Civil No. 98-065-B

Kenneth S. Apfel, Commissioner,
Social Security Administration


## O R D E R


Robert Espinoza applied for Title II Social Security

Disability Income ("SSDI") benefits in 1994, alleging disability

since May 14, 1993, due to problems with his knees, left ankle,

and hearing loss.[1]  He has not engaged in substantial gainful

activity, as defined by Social Security Administration ("SSA")

regulations, since May 14, 1993.  After the SSA denied Espinoza's

application, he requested a hearing before an Administrative Law

Judge ("ALJ").  ALJ Frederick Harap held a hearing on Espinoza's

claim on April 8, 1996, and issued a decision denying his

application the following month.  Espinoza then filed a request

for review with the Appeals Council, submitting additional

---

[1]  Because Espinoza does not challenge the ALJ's finding
that he does not suffer from a hearing impairment sufficient to
impact his vocational opportunities, I do not address the issue
in this order.

medical records which were not before the ALJ when he rendered his decision. The Appeals Council subsequently denied Espinoza's request for review, making the ALJ's decision the final decision of the Commissioner of the Social Security Administration ("Commissioner").

Espinoza brings this action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C.A. § 405(g) (West Supp. 1998) ("the Act"), seeking review of the SSA's decision denying his claim for benefits. For the reasons set forth below, I uphold the SSA's decision.

## FACTS[2]

Espinoza, now 40, was 37 years old at the time ALJ Harap denied his claim for benefits. He is a high school graduate and attended college for two to three years. He served in the Navy from 1977 to 1981, working as a sonar technician. After receiving an honorable discharge, Espinoza held jobs as a golf course groundskeeper, mail handler/clerk, cable handler, cable tradesman, and a heavy equipment operator. See Tr. at 50.

Espinoza injured both of his knees after falling through a hatch aboard a submarine in 1978. He underwent three

---

[2] **Unless otherwise noted, the following facts are taken from the Joint Statement of Material Facts submitted by the parties to this action.**

arthroscopic surgeries on his knees between 1982 and 1985. He was advised after the surgeries to start a Nautilus physical therapy program. X-rays of his knees in February 1986 were negative. Espinoza testified before the ALJ that his left knee gives out and his right knee locks up about four times a week.[3] See Tr. at 53, 55. Since surgery to his left ankle in December 1994, Espinoza stated that merely walking up a set of stairs has caused his knees to give out or lock up. See Tr. at 55. In January 1996, he was advised to begin physical therapy for his knees. See Tr. at 332.

Espinoza injured his left ankle during a basketball game in 1981, while he was serving in the Navy. The ankle was operated on that same year. See Tr. at 50. Espinoza's ankle was examined upon his discharge from the service in August 1981. There was no evidence of dislocation, but a small calcific fleck indicated the possibility of a sprain fracture. Espinoza was scheduled to undergo physical therapy for his ankle, but he never attended the sessions. The following spring, in 1982, Espinoza played lacrosse for the University of New Hampshire.

_____

[3] In his decision, the ALJ erroneously stated that Espinoza's knees lock up or give out four times a month.

In October 1982, Espinoza requested a brace for his left ankle so that he could run. In March 1983, he stated that his ankle was weak and sometimes gave out. An examination at that time found no abnormalities. In September 1983, Espinoza again requested a brace, stating that the ace bandage he was using did not provide enough support. In September 1986, he reported that his left ankle often gave out on him.

Espinoza requested an air cast and ankle brace in June 1993, the same month that he requested an increase in his service-connected disability due to limited motion of his left ankle.[4] Upon examination, Espinoza's range of motion in his left ankle was the same as his right ankle. He did, however, exhibit severe crepitus[5] on side-to-side motion of his left ankle.

In October 1993, Espinoza was fitted with a custom molded hinged ankle stirrup with a heel cup. In April 1994, the stirrup was modified by cutting off the forefoot, leaving only the heel cup. A Dr. Harris of the Veterans Administration in Manchester,

---

[4] Espinoza had an initial service-connected disability of 0%, which increased to 10% effective June 8, 1993. His disability was increased temporarily to 100% in December 1994, when he underwent ankle surgery. Espinoza's disability was again lowered to 10% in June 1995, and raised to 20% later that year.

[5] Crepitus is "noise or vibration produced by rubbing bone or irregular cartilage surfaces together." Stedman's Medical Dictionary 409 (26th ed. 1995).

N.H., wrote a note on Espinoza's behalf in September 1994 to assist Espinoza's search for job training through the VA. Dr. Harris's note stated that Espinoza's left ankle pain and instability prevented him for standing for long periods of time or walking on uneven surfaces.

Espinoza underwent ligament reconstruction surgery on his left ankle at the VA Medical Center on December 16, 1994.[6] During surgery, a spur on the ankle bone was removed. Upon discharge, Espinoza's left ankle was in a short leg cast and he used crutches.

Espinoza saw Dr. James M. Shea at the request of the VA in February 1995. He reported that his left ankle continued to bother him. He used crutches and wore a large splint, and noted that he was being treated for an infection that developed after his ankle surgery. Although Espinoza complained of persistent drainage from his surgery scar, the wound was dry. Dr. Shea noted that Espinoza resisted attempts at moving his ankle,

---

[6] Espinoza applied for benefits, claiming an onset date of May 14, 1993, the date he was discharged from his job for reasons unrelated to his alleged disabilities. At his hearing before the ALJ, however, he essentially conceded that he was not physically disabled until December 1994, when his left ankle was operated upon. See Tr. at 57. ("Q [by attorney]: So is it fair to say, sir, that your claim for disability really revolves around the operation that was done in December of '94? A: I'd say above and beyond a shadow of doubt, yes.")

complaining of discomfort. While the ankle was tender and there was moderate edema[7] of the entire foot and ankle, Espinoza did not demonstrate any instability. He could move his toes well and had good sensation. Dr. Shea stated, however, that Espinoza's left calf was 1-1/8 inches smaller in circumference than his right. See Tr. at 312.

Espinoza testified that he took "horrendous amounts of pain killers" from the date of his surgery until about July 1995, which caused him to lose "quite a bit of memory." Tr. at 60, 62. Espinoza was initially prescribed the pain killers oxycodone and hydroxyzine. In a statement filed in conjunction with his request for a hearing before an ALJ, Espinoza stated that he took a number of different pain medications daily. Although undated, the statement was clearly filed on or after February 27, 1995, the date on which he requested reconsideration and a hearing. See Tr. at 118. Among the medications listed were propoxyphene, indomethacin, acetaminophen and ibuprofen. At his hearing before the ALJ, Espinoza testified that he had also taken Percoset and Demerol for pain. The Percoset was prescribed for a period of about two months following surgery. See Tr. at 326.

---

[7] Edema is an accumulation of watery fluid. See Stedman's Medical Dictionary 544.

In March 1995, Espinoza was told to begin guarded weight bearing, using an air split to support his ankle. Swelling and pain limited Espinoza's progress, and he continued to complain of edema, pain and crepitus a month later. He was instructed to cut back on the weight bearing, which he did. He later reported that the rest seemed to make his ankle feel better.

In May 1995, Espinoza again began an exercise program to improve range of motion and strength. He wore an air cast stirrup support and used crutches at home, but wore a cast boot and used only a cane when outside. Espinoza reported that full weight bearing while using the stirrup caused pain, but that he was pain-free for four hours while using the cast boot.

By June 20, 1995, Espinoza was out of his walking cast, on crutches, for about four hours a day. The following week, however, he continued to wear the cast brace and complain of pain, instability and edema.

Following surgery, and continuing to the date of his hearing, Espinoza lived with friends. His friends performed the household chores. From December 1994 until about July of 1995, Espinoza testified that was able to fix himself meals, but generally slept until noon and spent the rest of the day watching television with his left leg elevated. See Tr. at 63. He would

also do his home physical therapy exercises.  See id.

As of December 28, 1995, Espinoza was taking the pain killer propoxyphene along with muscle relaxants.  See Tr. at 326.  The following month, his doctor cleared him to return to school.  Through the Department of Veterans Affairs, Espinoza enrolled in classes at New Hampshire Technical College in January 1996.  Around the same time, Espinoza stopped using crutches and relied on only a cane.  See Tr. at 67-8.

At the time of his hearing before the ALJ, Espinoza was attending classes at NHTC for three hours a day Mondays through Thursdays and one hour on Fridays.  He testified that he kept his left ankle elevated on a chair during class, noting that it would swell otherwise.  See Tr. at 69-70.  Espinoza testified that he continued to live with friends, who performed most of the household chores.  Espinoza stated that he took two Tylenol Three (Tylenol with codeine) pills each day to control his pain.  See Tr. at 62.  He testified that his pain was "tolerable" when he kept his leg elevated, and that he could stand for up to two hours.  See Tr. at 69, 70.

A residual functional capacity ("RFC") assessment dated January 10, 1995, conducted by Dr. Homer Lawrence on behalf of the SSA, found that Espinoza was capable of lifting and carrying

up to 10 pounds, sitting for up to 6 hours in an 8-hour workday, and standing or walking for up to 2 hours in an 8-hour workday. A second RFC assessment by Dr. A.C. Campbell, dated August 14, 1995, makes similar findings.

## STANDARD

After a final determination by the Commissioner denying a claimant's application for benefits and upon a timely request by the claimant, this court is authorized to: (1) review the pleadings submitted by the parties and the transcript of the administrative record; and (2) enter a judgment affirming, modifying, or reversing the Commissioner's decision. See 42 U.S.C.A. § 405(g) (West Supp. 1998). The court's review is limited in scope, however, as the Commissioner's factual findings are conclusive if they are supported by substantial evidence. See Irlanda Ortiz v. Secretary of Health and Human Servs., 955 F.2d 765, 769 (1st Cir. 1991); 42 U.S.C.A. § 405(g). The Commissioner is responsible for settling credibility issues, drawing inferences from the record evidence, and resolving conflicting evidence. See Irlanda Ortiz, 955 F.2d at 769. Therefore, the court must "'uphold the [Commissioner's] findings . . . if a reasonable mind, reviewing the evidence in the record

as a whole, could accept it as adequate to support [the Commissioner's] conclusion.'" Id. (quoting Rodriguez v. Secretary of Health and Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)).

If the Commissioner has misapplied the law or has failed to provide a fair hearing, however, deference to the Commissioner's decision is not appropriate, and remand for further development of the record may be necessary. See Carroll v. Secretary of Health and Human Servs., 705 F.2d 638, 644 (2d Cir. 1983); see also Slessinger v. Secretary of Health and Human Servs., 835 F.2d 937, 939 (1st Cir. 1987) ("The [Commissioner's] conclusions of law are reviewable by this court.") I apply these standards in reviewing the issues Espinoza raises on appeal.

## DISCUSSION

An ALJ is required to apply a five-step sequential analysis to determine whether a claimant is disabled within the meaning of the Act.[8] At step four, the ALJ must determine whether the

_____

[8] The ALJ is required to consider the following five steps when determining if a claimant is disabled:
(1) whether the claimant is engaged in substantial gainful employment;
(2) whether the claimant has a severe impairment that lasted for twelve months or had a severe impairment for a period of twelve months in the past;

claimant's impairments prevent him from performing his past work. See 20 C.F.R. § 404.1520(e). The ALJ must assess both the claimant's residual functional capacity ("RFC") -- i.e., what the claimant can do despite his impairments -- and the claimant's past work experience. See Santiago v. Secretary of Health and Human Servs., 944 F.2d 1, 5 (1st Cir. 1991). At step five, the burden shifts to the Commissioner to show that there is other work in the national economy that the claimant is capable of performing based on the claimant's RFC. See Heggarty v. Sullivan, 947 F.2d 990, 995 (1st Cir. 1991); Keating v. Secretary of Health and Human Servs., 848 F.2d 271, 276 (1st Cir. 1988). The Commissioner must show that the claimant's limitations do not prevent him from engaging in substantial gainful work, but need not show that the claimant could actually find a job. See Keating, 848 F.2d at 276 ("[t]he standard is not employability, but capacity to do the job").

Here, the ALJ concluded at the fourth step that Espinoza could not return to his past work because it required heavy,

---

     (3) whether the impairment meets or equals a listed impairment;
     (4) whether the impairment prevents or prevented the claimant from performing past relevant work;
     (5) whether the impairment prevents or prevented the claimant from doing any other work.
See 20 C.F.R. § 404.1520.

medium and light exertion as defined by SSA regulations.  The ALJ also found that Espinoza retained the ability to perform the full range of sedentary work.[9]  Applying the Medical-Vocational Guidelines, (the "Grid"), the ALJ found, at step five, that there were a significant number of sedentary jobs in the national economy which Espinoza could perform.  Thus, the ALJ found Espinoza was not disabled and denied his claim for benefits.

Espinoza claims that the ALJ erred in three respects. First, he claims, the ALJ failed to order a consultative psychiatric examination in the face of evidence pointing to a psychological impairment.  Second, that the ALJ improperly discounted Espinoza's subjective complaints of pain.  Finally, that the ALJ erred by relying on the Grid to support a finding that Espinoza is not disabled.

## A. __Alleged failure to order consultive psychiatric exam__

An ALJ is not required to order a consultative examination to investigate any or all of a claimant's alleged impairments.

---

[9] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met."  20 C.F.R. §404.1567(a)(1996).

See Matthews v. Bowen, 879 F.2d 422, 424 (8th Cir. 1989).  The regulations allow, but do not mandate, an ALJ to order an examination where there is insufficient evidence to determine whether or not a claimant is disabled.  See id.; 20 C.F.R. §416.919a.  Thus, the issue becomes whether the ALJ, without the benefit of a consultative examination, could have rendered a decision on the alleged disability.  See Matthews, 879 F.2d at 424.

Espinoza appears to argue that, because his attorney pointed out the existence of records indicating a psychological impairment to the ALJ and because those records were not before the ALJ, the ALJ had insufficient evidence to determine whether such an impairment existed.  Thus, Espinoza argues, the ALJ should have ordered a consultative exam.  I disagree.

The ALJ agreed to keep the record open for seven days in order to allow Espinoza's attorney time to submit the missing records.  See Tr. at 71.  His attorney apparently did not do so within the allotted time.  See Tr. at 3, 6.  These records were later submitted to the Appeals Council, which reviewed them and then declined Espinoza's request for review of the ALJ's decision.  Both parties point to the evidence contained in those records to support their arguments on the issue of whether the

-13-

ALJ erred by failing to order a consultative examination.  The law is unsettled as to whether I can consider that evidence, as it was not before the ALJ when he rendered his decision.[10]  I do not need to consider that evidence, however, as the record before the ALJ was sufficient to determine that Espinoza did not suffer from a psychological impairment.  Thus, the ALJ was not required to order a consultative exam.[11]

Espinoza's application for benefits, and his subsequent appeals, do not allege a psychological disability.  Rather, he applied for benefits based on his alleged knee, ankle and hearing impairments.  Indeed, during his hearing before the ALJ, Espinoza explicitly denied the existence of a psychological disability:

Q (by attorney): Okay.  Do you know - have you ever

---

[10]  The circuits have split as to whether evidence submitted only to the Appeals Council, and not to the ALJ, should be considered on appeal to a district court after the Appeals Council has denied review.  Cf. Falge v. Apfel, 150 F.3d 1320, 1322 (11th Cir. 1998)(holding that new evidence submitted only to the Appeals Council is not part of the administrative record for judicial review), cert. denied, 119 S.Ct. 907 (1999); with Perez v. Chater, 77 F.3d 41, 44 (2d Cir. 1996)(holding that new evidence is properly considered as part of the administrative record on judicial review).

[11]  It bears noting that, even if I were to consider the records referenced in the transcript and later provided to the Appeals Council, I would reach the same conclusion.  The records do not raise doubts about Espinoza's mental health.  Rather, they tend to support a finding that he does not suffer from a psychological impairment.  See Tr. at 344-50, 353-59.

-14-

> been a patient at a mental health center for post
> traumatic stress disorder?
> A (by Espinoza): No.
> Q: Do you have problems with controlling your emotions
> and with anger and outbursts?
> A: Not like I feel, no.
> Q: All right.  But --
> A: When someone who has a job that won't perform what
> they're supposed to, I get upset, or someone who talks
> to me disrespectfully because I believe in showing
> respect to those who show respect to me.

Tr. at 64-5.  Espinoza's testimony neither indicates the presence of a psychological disability, nor raises questions sufficient to prompt the ALJ to order a consultative exam.  Rather, his testimony provides evidence that Espinoza does not suffer from any such disability.

Similarly, the other evidence before the ALJ dealing with Espinoza's psychological health neither supports a finding that he is psychologically impaired nor raises questions sufficient to order a consultative psychiatric evaluation.  Espinoza was fired from a job after an altercation with a co-worker, but the record clearly reflects that Espinoza was cleared of any wrong-doing and that he was, in fact, wrongfully terminated.  Indeed, the state Department of Employment Security Appeal Tribunal found that Espinoza had "acted reasonably when he instinctively reacted by swinging and attempting to stop the object he thought was intended to hit him."  Tr. at 124-25.  Records from the state

Division of Vocational Rehabilitation reflect that Espinoza denied during his initial interview that he had problems with drugs, alcohol or anger, or that he needed any type of psychological counseling. See Tr. at 127. Espinoza stated that he was angry and frustrated with the process of applying for and receiving various benefits. He explicitly denied having an emotional condition that warranted an evaluation.

The records before the ALJ, as well as Espinoza's testimony, do not give rise to questions of psychological disability, even in the face of Espinoza's attorney pointing out the missing records. Rather, they show that Espinoza repeatedly denied the existence of a psychological problem to both the ALJ and others. Instead, he cited the often slow and complicated process of applying for and receiving various government benefits as the source of his anger and frustration. Espinoza's anger and frustration in this regard are both reasonable and understandable, and do not constitute evidence sufficient to suggest a psychological impairment. Thus, the ALJ did not err by failing to order a consultative psychological evaluation.

**B. ALJ's evaluation of Espinoza's pain complaints**

An ALJ is not free to disregard a claimant's subjective pain complaints merely because they cannot be corroborated by

objective medical evidence.  See SSR 96-7p; 20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2).  Rather, the ALJ must consider other evidence before determining whether the claimant's subjective complaints of pain are credible.  See 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).  Specifically, the ALJ must consider: (1) the claimant's daily activities; (2) the nature, location, onset, duration, frequency, radiation, and intensity of the pain; (3) the precipitating and aggravating factors; (4) the type, dosage, effectiveness, and adverse side-effects of any pain medications; (5) non-medication forms of treatment for relief of pain; (6) any functional restrictions; and (7) any other relevant factors.  Id.; see also Avery v. Secretary of Health and Human Services, 797 F.2d 19, 29 (1st Cir. 1986)

Here, the ALJ found that Espinoza's complaints of disabling pain were not entirely credible in light of both the medical evidence and Espinoza's own testimony regarding his medication, treatment and daily activities.  Espinoza argues that the ALJ either ignored or misconstrued the record in order to reach his conclusion.  I disagree.

Among other things, Espinoza notes that the ALJ did not mention Dr. Shea's notation that his left leg was a full 1-and-1/8 inches smaller in diameter than his right.  This evidence,

Espinoza argues, is a strong indication that pain prevented him from using that leg.  While arguably true, Dr. Shea examined Espinoza a mere two months after surgery.  The bulk of the medical records before the ALJ indicates that he continued to improve over the next several months.  By May 1995 he reported that he was pain-free for four hours while using his cast boot. By June 1995 he was using crutches for about four hours a day without the cast, despite complaints of pain.  By January 1996, he was well enough to attend school.  Around that same time, he stopped using crutches altogether and relied only on a cane.

In the six or seven months following surgery, Espinoza testified that he took "horrendous amounts" of pain killers, which caused him to lose memory.  He also stated that he had trouble sleeping due to his pain, despite taking the medications. See 20 C.F.R. §§ 404.1529(c)(3)(iv), 416.929(c)(3)(iv) (In making credibility determination, ALJ should consider the "type, dosage, effectiveness, and side effects of any medication" claimant has taken.).  At the time of Espinoza's hearing, however, he was taking only two Tylenol Three pills a day to control his pain. Indeed, the medical records indicate that, although Espinoza took a variety of pain killers for several months following surgery, over time he began to use less as his recovery progressed.  See

Tr. at 62, 118, 326.

At his hearing, Espinoza testified that continued with physical therapy one day per week.  Despite some pain and swelling, he testified that he was able to sit through several hours of class a day with his leg elevated.  He reported that his pain was "tolerable."  He used only a cane for walking, having discarded his crutches three months earlier.  He stated that he could stand for about two hours per day.

In his decision, the ALJ stated:

> While the claimant may subjectively experience some
> pain, in view of the objective medical evidence
> documented in the record, his functional capability,
> the nature of his condition and his treatment level, I
> find that his pain does not credibly interfere with his
> ability to perform the full range of sedentary work.

The ALJ cited not only the medical record, but also Espinoza's testimony regarding his daily activities, his medication, other treatment, and functional capabilities to support his finding that Espinoza's complaints were not entirely credible.  He noted that Espinoza's credibility was "further clouded" by his admission that his alleged disability did not arise until December 1994, despite his application for benefits alleging an onset date of May 1993.  The ALJ did not err in evaluating and ultimately discrediting Espinoza's subjective complaints of pain.

## C.   ALJ's use of the Grid

At step five of the sequential analysis, the burden shifts to the Commissioner to show that there are a significant number of jobs in the national economy that the claimant can perform. Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987); Goodermote v. Secretary of Health and Human Servs., 690 F.2d 5, 6-7 (1st Cir. 1982). "Where a claimant's impairments involve only limitations in meeting the strength requirements of work," the Medical-Vocational Guidelines, (the "Grid"), provide "a 'streamlined' method by which the [Commissioner] can carry this burden." Heggarty, 947 F.2d at 995 (quoting Ortiz v. Secretary of Health and Human Services, 890 F.2d 520, 524 (1st Cir. 1989).

Espinoza argues that the ALJ erred in applying the Grid because he suffers from non-exertional impairments which significantly limit his ability to perform the full range of sedentary work. See Heggarty, 947 F.2d at 995 (quoting Lugo v. Secretary of Health and Human Servs., 794 F.2d 14, 17 (1st Cir. 1986))( if a non-exertional limitation "significantly affects [the] claimant's ability to perform substantially the full range of jobs" at a given strength level, the Commissioner may not rely on the Grid to carry his burden and the testimony of a vocational expert is usually required). Specifically, Espinoza cites his alleged pain and psychological disorders.

-20-

As noted above, the record before the ALJ was sufficient to support a finding that Espinoza did not suffer from a psychological impairment. Furthermore, the ALJ did not improperly discredit Espinoza's subjective complaints of pain. There was substantial evidence in the record to support the ALJ's finding that Espinoza does not suffer from any non-exertional impairments such that they would limit his ability to perform the full range of sedentary work. The ALJ was thus entitled to apply the Grid to find Espinoza not disabled and deny his claim for benefits. See Heggarty, 947 F.2d at 995.

## CONCLUSION

I uphold the ALJ's decision and deny Espinoza's motion for an order reversing the Commissioner's decision (document no. 8) and grant Defendant's motion for an order affirming the Commissioner's decision (document no. 9). The clerk is instructed to enter judgment accordingly.

SO ORDERED.

_____
Paul Barbadoro
Chief Judge

April 30, 1999

cc:  Raymond J. Kelly, Esq.
     David L. Broderick, AUSA